AO 91 (REV.5/85) Criminal Complaint  USA Patrick J. Fitzgerald, AUSAs Vicki Peters and Daniel J. Collins (312) 886-3482

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

        v.

DAVID C. HEADLEY,
      also known as "Daood Gilani"

**FILED**
Oct 11 2009
OCT 1 1 2009
MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT

**CRIMINAL COMPLAINT**

CASE NUMBER **09 CR 830**

**UNDER SEAL**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

Count One - Conspiracy to Murder and Maim in a Foreign Country
Beginning no later than in or about late 2008 and continuing until on or about October 3, 2009, at Chicago, in the Northern District of Illinois and elsewhere, defendant DAVID C. HEADLEY, within the jurisdiction of the United States, conspired and agreed with others, including individuals herein identified as Individual A, Lashkar e Taiba Member A, and Ilyas Kashmiri, to commit acts outside the United States that would consitute the offenses of murder and maiming if committed in the special maritime and territorial jurisdiction of the United States; and a conspirator committed an act within the jurisdiction of the United States to effect an object of the conspiracy;  in violation of Title 18, United States Code, Section 956; and

Count Two - Providing Material Support to Terrorists
Beginning no later than in or about late 2008 and continuing until on or about October 3, 2009, at Chicago, in the Northern District of Illinois and elsewhere, defendant DAVID C. HEADLEY conspired with others, including individuals herein identified as Individual A, Lashkar e Taiba Member A, and Ilyas Kashmiri, to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of such material support and resources, knowing and intending that they were to be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956, as further set forth above in Count One; all in violation of Title 18, United States Code, Section 2339A;

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
LORENZO BENEDICT
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

October 11, 2009
Date

at Chicago, Illinois
City and State

ARLANDER KEYS, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

<u>UNDER SEAL</u>

## <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT</u>

I, Special Agent Lorenzo Benedict, having been duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2004. I am currently assigned to conduct counter-terrorism investigations and have served in this position since March 2005. While working as a Special Agent, I have directed or otherwise been involved in investigating violations of federal law. I have completed FBI training in the investigation of counter-terrorism matters. As a result of my training and experience, I am familiar with the tactics, methods and techniques of terrorist networks and their members.

2.     I submit that on the basis of the facts set forth in this affidavit, there is probable cause to believe that:

    a.     Beginning no later than in or about late 2008 and continuing until on or about October 3, 2009, at Chicago, in the Northern District of Illinois and elsewhere, defendant DAVID C. HEADLEY, within the jurisdiction of the United States, conspired and agreed with others, including individuals herein identified as Individual A, Lashkar-e-Taiba Member A, and Ilyas Kashmiri, to commit acts outside the United States that would consitute the offenses of murder and maiming if committed in the special maritime and territorial jurisdiction of the United States; and a conspirator committed an act within the jurisdiction of the United States to effect an object of the conspiracy; in violation of Title 18, United States Code, Section 956; and

    b.     Beginning no later than in or about late 2008 and continuing until on or about October 3, 2009, at Chicago, in the Northern District of Illinois and elsewhere, defendant DAVID C. HEADLEY conspired with others, including individuals herein identified as Individual A, Lashkar-e-Taiba Member A, and Ilyas Kashmiri, to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of such material support and resources, knowing and intending that they were to be used in preparation for, and in carrying out, a

1

violation of Title 18, United States Code, Section 956, as further set forth above in Count One; all in violation of Title 18, United States Code, Section 2339A.

3.   This affidavit is based on my personal knowledge, on my review of records and other materials obtained during the course of this investigation, including intercepted telephone conversations and emails, as well as information provided to me by other investigators during the course of this investigation. Searches and surveillance have been conducted pursuant to lawful court orders. Because this affidavit is for the limited purpose of setting forth facts sufficient to establish probable cause, this affidavit does not include all of the pertinent facts that I have learned in the course of this investigation.

4.   This affidavit summarizes the contents of certain recorded conversations. Most of these recorded conversations were in the Urdu language. While translators have attempted to transcribe the foreign language conversations accurately, to the extent that quotations from these communications are included, these are preliminary, not final translations. Voice identifications for the calls are preliminary. In most instances, voice identifications are based on names used during the intercepted conversations, voice recognition that has been accomplished to date by investigators, historical information developed during this investigation, toll records, physical surveillance and subscriber information.

5.   This affidavit also includes descriptions of the contents of email communications, some of which were partially in the Urdu language. While translators have attempted to transcribe the foreign language portions of emails accurately, to the extent that quotations from these emails are included, these are preliminary, not final translations. Quotations from English language emails in this affidavit are as they appeared when they were sent

2

or received, including typographical and other errors. Based on my training and

experience, my consultation with translators, and the context of this investigation, I have

included brackets where appropriate to explain my understanding of the recorded

conversations and emails, including the coded language and terms used. The summaries

below do not include all potentially criminal conversations that have occurred during this

investigation or all statements or topics covered during the course of the conversations

described below.

### Summary

6.      As further set forth in this Affidavit, the evidence gathered to date by the government's

investigation establishes probable cause to believe that DAVID C. HEADLEY

("HEADLEY") participated with others in a conspiracy to commit terrorist acts involving

murder and maiming outside the United States, and that HEADLEY and others conspired

to provide material support to that conspiracy. Among other things, HEADLEY

conducted extensive surveillance for the purpose of facilitating terrorist attacks, working

in coordination with: an individual herein identified as "Individual A;" an individual

herein identified as Lashkar-e-Taiba Member A (a member of Lashkar-e-Taiba, a

Pakistani-based terrorist organization); Ilyas Kashmiri (a leader of Harakat-ul Jihad

Islami ("HUJI"), another Pakistani-based terrorist organization); and others.

7.      More specifically, beginning in or about late 2008 and continuing until his arrest on

October 3, 2009, HEADLEY identified and conducted surveillance of potential targets of

terrorist attacks in Denmark, and reported and attempted to report on the results of his

surveillance and related matters to other members of the conspiracy, including, among others: Individual A; Lashkar-e-Taiba Member A, and Ilyas Kashmiri.

8. Beginning in late 2008, HEADLEY corresponded with Individual A and Lashkar-e-Taiba Member A regarding what they referred to in coded communications as the "Mickey Mouse Project," "mmp," and "the northern project," which involved planning for one or more attacks directed at facilities and employees of the *Morgenavisen Jyllands-Posten* ("*Jyllands-Posten*"), a Danish newspaper which in 2005 published cartoons depicting the Prophet Muhammed, to which many Muslims took great offense. In October 2008, HEADLEY had posted a message to an internet discussion group stating, with respect to the Danish cartoonists and others he identified as "making fun of Islam," that "I feel disposed towards violence for the offending parties." Individual A is associated with, among other entities, the Lashkar-e-Taiba terrorist organization and with Ilyas Kashmiri, a leader of Harakat-ul-Jihad-Islami ("HUJI"), a Pakistani-based terrorist organization. HEADLEY and Individual A communicated with associates, including Kashmiri and Lashkar-e-Taiba Member A, regarding the planned attack.

9. In January 2009, after extensive correspondence with Individual A regarding the Mickey Mouse Project, in the course of which Individual A urged HEADLEY to "try to go as early as possible to MMP," HEADLEY traveled to Copenhagen, Denmark. During that trip, HEADLEY visited two different offices of the *Jyllands-Posten* – in Copenhagen and in Arhus, Denmark. As cover for his visits to the *Jyllands-Posten* offices, HEADLEY falsely represented that he was visiting on behalf of an immigration business; that this

4

immigration business was considering opening up offices in Denmark; and that he was interested in advertising the business in the *Jyllands-Posten*.

10. After visiting Denmark in January 2009, HEADLEY traveled to Pakistan to meet with Individual A. During this trip, HEADLEY traveled with Individual A to the Federally Administered Tribal Area (FATA) region in northwestern Pakistan and met with Kashmiri. HEADLEY returned to Chicago in mid-June 2009.

11. Following HEADLEY's return from Pakistan, HEADLEY communicated by email with Lashkar-e-Taiba Member A regarding the status of the Northern Project. Because Lashkar-e-Taiba Member A responded that he had "new investment plans," coded language for the planning of a different attack, HEADLEY and Individual A began to focus on working with Kashmiri to complete the attack on the newspaper.

12. In late July 2009, HEADLEY traveled again to Copenhagen, Denmark, and to other locations in Europe. When HEADLEY returned to the United States, he told a Customs and Border Patrol inspector that he was traveling on business as a representative of an immigration business. HEADLEY's luggage contained no papers or other documents relating to such business.

13. Following HEADLEY's return to Chicago in August 2009, HEADLEY used coded language to inquire of Individual A on multiple occasions regarding whether Individual A had been in touch with Kashmiri regarding planning for the attack. HEADLEY expressed concern that Individual A's communications with Kashmiri had been cut off.

14. In early September 2009, Individual A called HEADLEY to report that Kashmiri might be dead. HEADLEY expressed dismay and concern, and said that Kashmiri's death

5

means "our company has gone into bankruptcy then," and that "the projects and so forth will go into suspension." Shortly after initial press reports that Kashmiri had been killed in a drone attack in Pakistan, HEADLEY and Individual A had a series of coded conversations in which they discussed the reports of Kashmiri's death and the significance of Kashmiri's death for the projects they were planning. Individual A sought to reassure and encourage HEADLEY, telling him, among other things, that "[t]his is business sir; these types of things happen."

15. On or about September 17, 2009, HEADLEY discussed with Individual A the need, in light of Kashmiri's reported death, to turn back to Lashkar-e-Taiba Member A and another individual, to complete the planning for the attack on the newspaper.

16. On or about September 20, 2009, HEADLEY told a family member in a recorded telephone conversation words to the effect "that the main thing is the business must go on." HEADLEY also stated words to the effect that it does not matter for which company he works.

17. On or about September 30, 2009, HEADLEY was told by Individual A that Kashmiri was still alive. When HEADLEY asked whether he would meet Kashmiri on his trip, Individual A advised that Kashmiri had been asking about HEADLEY.

18. HEADLEY stated in intercepted communications that he intended to travel to Pakistan in early October 2009 to meet with Individual A and Kashmiri. HEADLEY had a reservation to fly from Chicago, Illinois to Philadelphia, Pennsylvania on October 3, 2009 and indicated in intercepted communications that he intended to travel on to Pakistan.

19.   HEADLEY was arrested by FBI agents on October 3, 2009 as he prepared to board a flight from Chicago to Philadelphia. After being advised of his rights, HEADLEY made statements to FBI agents. Among other things, HEADLEY stated that beginning prior to 2006 HEADLEY worked at various times with Lashkar-e-Taiba (an organization he knew to be a designated foreign terrorist organization) and that he received training from Lashkar-e-Taiba. HEADLEY also stated that at times he worked with Ilyas Kashmiri, including in connection with planning the Denmark attack.

20.   With respect to his activities in Denmark, HEADLEY stated that he conducted surveillance of the Jyllands-Posten offices in Copenhagen and Arhus, Denmark, in preparation for an attack to be carried out by persons associated with Kashmiri and Individual A. HEADLEY stated that he proposed that the operation against the newspaper be reduced from attacking the entire building in Copenhagen to killing the paper's cultural editor, Flemming Rose, and the cartoonist who drew a cartoon of the Prophet Mohammed with a bomb in his turban, Kurt Westergaard, whom HEADLEY felt were directly responsible for the cartoons. HEADLEY also stated that he conducted surveillance of Danish troops posted nearby, as well as of a nearby synagogue. HEADLEY stated that the surveillance of the Danish troops was conducted because they were posted near the newspaper and might serve as a reaction force in the event of an attack. He also said that he conducted the surveillance of the synagogue at the direction of Lashkar-e-Taiba Member A, whom HEADLEY described as being under the mistaken belief that Rose was Jewish.

## Relevant Individuals

### *David Coleman Headley*

21.     HEADLEY changed his name from "Daood Gilani" in or about 2006.  In an August

2009 interview with Customs and Border Patrol, HEADLEY advised that he changed his

name so as to raise less suspicion when he traveled.

22.     HEADLEY at times has claimed to be a consultant with or representative of an

immigration business.  Surveillance of HEADLEY's activities, as well as HEADLEY's

phone conversations and email exchanges, reflect that HEADLEY performs few services

for such business.  HEADLEY has no known or reported employment other than with

such business.  His residence in Chicago is an apartment leased to an individual who is

deceased.  Notwithstanding his apparent lack of financial resources and substantial

employment, HEADLEY has engaged in extensive international travel since at least

2006, including multiple trips to Pakistan, India, Denmark, and other countries in Europe.

Records reflecting the locations of internet protocol addresses used by HEADLEY to

send emails indicate that HEADLEY has spent substantial time in Pakistan and elsewhere

during the last several years – often for months at a time.

### *Individual A*

23.     Emails between HEADLEY and third parties reflect that Individual A was arrested by

Pakistani authorities in Summer 2009 and later released.  As noted above, Individual A is

associated with the Lashkar-e-Taiba terrorist organization, and with Ilyas Kashmiri, a

leader of Harakat-ul-Jihad-Islami ("HUJI"), a Pakistani-based terrorist organization,

among other entities.

8

*Lashkar-e-Taiba Member A*

24.    Lashkar-e-Taiba has been designated by the United States Department of State as a

Foreign Terrorist Organization since 2001. Based in Pakistan, Lashkar-e-Taiba has

claimed responsibility for numerous terrorist attacks, principally in India. Lashkar-e-

Taiba Member A, whose identity is known to the government, is an individual with

substantial influence and responsibility within Lashkar-e-Taiba.

*Ilyas Kashmiri*

25.    International news media reports have identified Kashmiri as the operational chief of the

Azad Kashmir section of Harakat-ul-Jihad-Islami ("HUJI") with links to al Qaeda. In

April 2006, the United States Department of State issued the 2006 "Country Reports on

Terrorism," which listed a number of designated "foreign terrorist organizations" and also

listed "other selected terrorist groups also deemed to be of relevance to the global war on

terrorism." HUJI was listed in the latter category. The report noted the group's "links to

al Qaeda," and that "HUJI's operations in Kashmir were led by Commander Ilyas

Kashmiri, a former commander in the Afghan jihad, . . . . [who] was arrested in October

[2005] on charges of attacks against President Musharraf in 2003." In September 2009,

international news media reported that Kashmiri had been killed in a drone attack in the

Waziristan region of Pakistan.

26.    On September 18, 2009, HEADLEY reviewed an article concerning Kashmiri's reported

death, entitled "Pakistani Kashmiri militants now fighting NATO forces," which

contained a number of details relating to Kashmiri, including the following:

   a.    Kashmiri was the ameer [leader] of the Azad Kashmir chapter of HUJI;

9

b.     Kashmiri was considered to be one of the most dangerous al Qaeda-linked Pakistani commanders;

c.     Kashmiri was no. 4 on the Pakistani Ministry of Interior's Most Wanted List;

d.     Kashmiri had established a training camp in the Razmak region of Waziristan;

e.     Kashmiri was named in a 12-page charge sheet filed by the Islamabad police in an anti-terrorism court for his role in the November 2008 murder of retired Major General Amir Faisal Alvi, the former General Officer Commanding of the Pakistan Army's Special Services Group. The charge sheet identified three people in the Alvi murder, including retired Major Haroon Ashiq, and alleged that the murder was carried out on the instructions of Kashmiri, who also had provided funds and weapons; and

f.     Kashmiri also was named in a charge sheet relating to the October 2008 kidnaping of a renowned film producer and distributor. Major Haroon Ashiq was one of the kidnapers.

This same article reported that, following his arrest, Major Haroon Ashiq had told interrogators that Haroon, along with his younger brother Captain Khurram, had "joined hands" with Kashmiri in early 2008. The article stated that, according to Haroon, Kashmiri had tasked Haroon with kidnaping affluent people living in urban areas in order to raise money for Kashmiri's group.

27.    On or about September 19, 2009, HEADLEY spoke by telephone to a family member and, using coded language, brought up the subject of Kashmiri's reported death. HEADLEY asked the family member if the family member had learned anything about "doctor," and stated words to the effect of: "[h]e was you Pir Sahib [spiritual guide], where I and you went, we went to Samanabad and we did Baiat [an oath of allegiance]." After the family member responded, "[y]es sir, absolutely, absolutely," HEADLEY

10

continued "he just had a heart attack . . . it has made me very sad." Based on my review of HEADLEY's communications concerning Kashmiri's death, I believe that the term "heart attack" in this context to be a coded reference to the reported fact that Kashmiri had been killed.

28. In the same conversation of September 19, 2009, HEADLEY continued to discuss Kashmiri, noting the press coverage following his reported death. HEADLEY stated words to the effect of: "now many other great things about him have come to surface, his supernatural powers and miracles, from his followers and others, yeah, they have also printed a small paper about him and many other things."

### Methods of Communication

29. HEADLEY, Individual A, and Lashkar-e-Taiba Member A have used several methods of communication, including in-person meetings, telephone conversations (including calls placed using long distance calling cards) and emails. HEADLEY, in particular, utilized a cell phone, the account for which is the name of a deceased individual. In nearly all of their communications, HEADLEY, Individual A, and Lashkar-e-Taiba Member A have used coded language. As discussed below, in addition to "Mickey Mouse Project," "mmp" and "the northern project," the co-conspirators have referred to this plot, as well as discussions of other targets, as "investments," "projects," "business," "action" and other like terms, and have described theirs hopes for success both in terms of receiving religious awards, as well as getting "rich," "richer," and making "profit."

30. Since the beginning of 2008, HEADLEY has communicated through the use of multiple email accounts. As discussed throughout this affidavit, HEADLEY, Lashkar-e-Taiba

11

Member A, and Individual A have frequently used coded language and changed their methods of communications in order to conceal the nature and content of their communications. For example, on or about August 28, 2009, in a recorded telephone conversation between HEADLEY and Individual A, HEADLEY spoke in coded language to describe a new account that HEADLEY had created for their continued communications. More specifically, after informing Individual A that he had formed an account on the "same system," HEADLEY instructed him to write his colleague's name and his younger brother's name and write the names without spaces and write 1 with it. On or about August 25, 2009, HEADLEY created such an account with a name blending two first names.

### The Danish Cartoons

31.  On or about September 30, 2005, the Danish daily newspaper *Jyllands-Posten* published an article entitled "Muhammeds ansigt" ("The face of Muhammed"). The article consisted of twelve cartoons, some of which depicted Muhammed, and an explanatory text. The cultural editor for the *Jyllands-Posten* wrote:

> The modern, secular society is rejected by some Muslims. They demand a special position, insisting on special consideration of their own religious feelings. It is incompatible with contemporary democracy and freedom of speech, where one must be ready to put up with insults, mockery and ridicule. It is certainly not always attractive and nice to look at, and it does not mean that religious feelings should be made fun of at any price, but that is of minor importance in the present context. ... we are on our way to a slippery slope where no-one can tell how the self-censorship will end. That is why Morgenavisen Jyllands-Posten has invited members of the Danish editorial cartoonists union to draw Muhammed as they see him.

32. The publication of the cartoons caused significant controversy in the Muslim community. Many Muslims took great offense to depictions of the Prophet Muhammed.

33. On or about October 29, 2008, HEADLEY (using the name Daood Gilani) posted a message to the Yahoo group called "abdalians"[1]:

> Everything is not a joke [identified individual being addressed by HEADLEY]. We are not rehearsing a skit on Saturday Night Live. Making fun of Islam is making fun of Rasoosallah SAW [Messenger of Allah, Peace be on Him], . . . **call me old-fashioned but I feel disposed towards violence for the offending parties, be they cartoonists from Denmark** or Sherry Jones (Author of Jewel of Medina) or Irshad Manji (Liberal Muslim trying to make lesbianism acceptable in Islam, amongst other things) . . . **They never started debates with folks who slandered our Prophet, they took violent action.** Even if God doesn't give us the opportunity to bring our intentions to fruition, we will claim ajr [a religious award] for it . . .

(Emphasis supplied).

### The Mickey Mouse Project

34. Records of email accounts used by HEADLEY reflect that between in or about August 2008 and December 7, 2008, HEADLEY sent multiple email messages from internet addresses located in the Pakistani cities of Karachi and Lahore. On or about December 7, 2008, before traveling from Pakistan to the United States that same day, HEADLEY used one of his email accounts to save a list of items, which was titled "Mickey Mouse." The list included the following pertinent entries:

> Route Design (train, bus, air)
> Cross (Cover Authenticator)
> Trade? Immigration?

---

[1] A review of the content of the messages in this Yahoo group make clear that its members are graduates of a military school in Hasan Abdal, Pakistan. HEADLEY has posted multiple messages to this group, and has referred in one or more postings to his own attendance at the school.

13

Ad? (Lost Luggage)(Business)(Entry?)
Kings Square (French Embassy)
YMCA
Car Trip + Train Option (Nufoozur Rehman)(weekend?)
Residence for clients
Complete Area Coverage (P.S. e.t.c.)
Counter surveillance (magic eye)
NDC option
Lunch + Coffee spots
Security (armed)?
Foreman residence
Zoom
Entry and exit method in the house
Feasible plan
On return, procurement of machinery
Uniform
Mixed Fruit Dish
Cell phone and camera
Border Crossing
City Guide Map
Alternate Investment
Got Papers? (Clients)
Make Visiting Cards

35. The *Jyllands-Posten* maintains a location at Kings Square in Copenhagen. The French

Embassy is immediately adjacent to that location.

36. On or about December 16, 2008, HEADLEY sent an email from Chicago, Illinois to

Individual A. Among other statements, HEADLEY told Individual A in this email that "I

will be going for the Mickey Mouse project in the north in the middle of next month. Let

me know any new info on it."

37. One week later, on or about December 23, 2008, HEADLEY again communicated with

Individual A concerning the Mickey Mouse project. More specifically, in an email sent

from Chicago, Illinois, to Individual A, HEADLEY stated:

14

Send me the info on the mickey mouse project later when I tell you. For now, **should I leave here early or around the 14th like previously planned.**[2] Do that special thing you do and tell me. . . .
Bye,
Dave

(Emphasis supplied).

38. On or about December 24, 2008, Individual A responded to HEADLEY's email from the previous day, telling HEADLEY to "try to go as early as possible to MMP." In response, HEADLEY used code to request Individual A to use a different email address to further communicate with HEADLEY. More specifically, HEADLEY stated:

Planning for MMP. send me info about it on other mail I gave starting with [the first four letters of one of Headley's email accounts] if you don't have it i will mail you from it. . . . How is your friend Harry. Did you check the lady naipaul link.[3] . . .
Ok take care.
Dave

39. The next day, on or about December 25, 2008, Individual A responded:

i know ur other email address, no need to use that address yet..**first u visit MMP than we will discuss and c the concerned person** if needed, and if your friends decline , we'll do that ,i have discussed with baray log . . .

---

[2]     As described further below, HEADLEY departed from Chicago on January 13, 2009, before arriving in Copenhagen, Denmark days later.

[3]     Lady Naipaul is a Pakistani journalist and the wife of the late Lord V. S. Naipaul, a Nobel prize winning author. Lady Naipaul also is the sister of Amir Faisal Alvi, the former Pakistani General killed in November 2008, allegedly by a group that included Major Haroon. Although Pakistani press reports reflect that Haroon was arrested by Pakistani police on or about February 24, 2009 in connection with General Alvi's murder, it is noteworthy that this email reference to Individual A's "friend Harry" in the context of "the Lady Naipaul link" occurred in late December 2008, shortly after General Alvi's murder and well before public reports of Haroon's involvement in the murder, and police action against Haroon. I understand "Harry" to be a reference to Haroon.

(Emphasis supplied). I believe that from a review of emails before and after this exchange, as well as subsequent telephone conversations between HEADLEY and Individual A, discussed more fully below, that Individual A was instructing HEADLEY to travel to Copenhagen, then travel to Pakistan to meet with Individual A ("we will discuss") and a third party ("c the concerned person"). Based on my review of subsequently intercepted communications, I believe that the "concerned person" was Kashmiri.

40. Additionally, in the same December 26, 2008, email, HEADLEY once again related to Individual A that, prior to departing for the Mickey Mouse project, his plans:

> Yes I am ready for MMP but I think it will better to go after new year as everything is shut down from Christmas to new year. . . . **I will spend a week or so the first time to get a feel of the property.** If you have any other helpful info on this project, send it to me. If God wants **i will return by middle of next month to you.** If this Amal is maqbool and I get Ajr for it, I want my father to gt that Ajr.

(Emphasis supplied). I understand that HEADLEY is telling Individual A that he will visit Denmark, then, after getting a "feel of the property," meet with Individual A in Pakistan ("return by middle of next month to you"). Further, I understand the English meaning of "Amal" is good deed, "maqbool" is acceptable and "Ajr" is a religious award.

### HEADLEY's First Visit to Denmark

41. On or about Sunday, January 12, 2009, HEADLEY emailed Individual A concerning his upcoming travel. HEADLEY stated "I am leaving WED night your time and will be at the location Thursday [January 15] night your time. Pray that I make a lot of money on the project."

16

42.     On or about January 15, 2009, HEADLEY arrived in Frankfurt, Germany.  On or about

January 19, 2009, HEADLEY emailed an associate, the subject of which was

"Copenhagen," and the body of which contained the following pertinent part:

> I checked out business opportunities here.  They seem quite promising. **I am
> going rght now to see if I can put an ad for our company** and also check the
> feasibility to open up an office here. . . .
> Bye for now,
> Dave

(Emphasis supplied).

43.     On or about January 20, 2009, HEADLEY sent another email to an associate, the subject

of which was described "Copenhagen **Important**" (emphasis in original).  HEADLEY

stated in relevant part:

> Everything is fine here.  I went to a newspaper to find out about advertising our
> company.
>
>                                     * * *
>
> Ok take care,
> Dave

44.     Later that same day, on or about January 20, 2009, HEADLEY sent another email, the

subject of which was described "Copenhagen."  HEADLEY wrote, in relevant part:

> I will leave this hotel Thursday morning and go to another city in this country for
> my vacation.  I haven't decided which one, maybe arhus. ...
> Take care,
> Dave

45.     On or about January 23, 2009,  HEADLEY visited the *Jyllands Posten* office in Arhaus,

Denmark, again under the auspices of checking rates for advertising in this newspaper.

17

That same day, HEADLEY sent an email to an associate, the subject of which was described as "Copenhagen and Arhaus." HEADLEY wrote in relevant part:

> I checked for our office ad in Arhus as well. . . .
> Dave

46. On or about January 26, 2009, an email was received from a sales coordinator at the *Jyllands-Posten*. The email stated in relevant part:

> Dear David C. Headley,
>
> thank you for your visit at Jyllands-Posten Friday last week [January 23, 2009] concerning advertising in our newspaper.

47. On or about January 29, 2009, a response was sent to the aforementioned email, stating:

> Thank you for your reply. I will be in touch soon. I am trying to coordinate with a local attorney in Denmark for taking care of our clients locally. I intend to visit you in the coming spring. Sincerely, Dave.

48. Although at times – including in his dealings with the *Jyllands-Posten* and an interview with a Customs and Border Protection officer in August 2009 – HEADLEY has held himself out as a representative of or consultant for an immigration business, this business has issued neither a W2 or 1099 to HEADLEY in the years 2004 through 2008.

49. HEADLEY's representations that his travel to Denmark was for the purposes of opening an office for an immigration business in Denmark were implausible for multiple reasons, including, among others, the following:

    a. A review of phone records for both HEADLEY's home and personal cell phones, as well as the phone records for five separate lines at the immigration business for which HEADLEY claimed to be working, has revealed not one phone call to Denmark during 2009;

18

b.      A search of emails originating from HEADLEY, and the immigration business' accounts in Chicago for 2009 has revealed no records reflecting the use of the services of that business by Danish residents;

c.      Although Headley and Individual A discussed the trip to Denmark for the Mickey Mouse project extensively in email exchanges and by telephone, their intercepted conversations and emails did not touch on the immigration services business, efforts to establish an office in Denmark or the need for advertising;

d.      Had HEADLEY been interested in obtaining information about advertising in the *Jyllands-Posten*, such information is readily available on the newspaper's web site, as is the name and phone number of the newspaper's sales representative;

e.      Prior to his visit to Denmark, he had expressed his displeasure at the *Jyllands Postens* cartoonists "who slandered our prophet," and said that "I feel disposed towards violence for the offending parties," making it unlikely that HEADLEY would seek to patronize the *Jyllands-Posten* as a business advertiser;

f.      The list of items relating to the Mickey Mouse Project on December 7, 2008, described above, contains multiple references that do not appear consistent with plans to open an immigration office, including "Route Design (train, bus air)"; "Cross (Cover Authenticator)"; "Counter surveillance (magic eye)"; "Security (armed)?"; "Zoom"; and "Entry and exit method in the house." Based on my training and experience, I believe that these notations, particularly in the context of the other information related in this Affidavit, are consistent with planning for a terrorist attack. The list also includes a reference to "Residence for clients." In my experience, it is unnecessary for the typical immigration services business to provide a residence for its clients; by contrast, a team assigned to carry out a terrorist attack in a city where the team's members did not reside would need one or more locations to live while preparing to carry out the attack;

g.      To date, no advertisements have been placed in the *Jyllands-Posten* for the immigration business.

### HEADLEY Travels to Pakistan Following Denmark Visit

50.     On January 24, 2009, HEADLEY departed from Frankfurt, Germany to the United Arab Emirates. From there, as discussed below, he subsequently traveled to Pakistan. Records of email accounts reflect that between in or around late January and early March 2009, HEADLEY sent multiple email messages from locations in Pakistan.

51. As described earlier, on December 25, 2008, prior to HEADLEY's departure for Denmark, Individual A instructed HEADLEY as follows: "first u visit MMP than we will discuss and c the concerned person if needed." Further, on December 26, 2008, HEADLEY responded that he would get a "feel of the property" and "return by middle of next month to you [Individual A]."

52. In a later email with the "abdalians" Yahoo group, HEADLEY confirmed his trip to the Federally Administered Tribal Area ("FATA") region in northwestern Pakistan, bordering Afghanistan, a region in Pakistan in which various terrorist organizations operate. More specifically, on or about May 4, 2009, a member of the group sent an email to the group discussing a recent survey concerning drone attacks in that area. The member's email stated in relevant part:

> . . . a think tank of researchers and political activists from the NEWFTP and FATA, conducts research, survey and collects statistics on various issues concerning the Taliban and al-Qaeda terrorism and human security there. AIRRA research teams go deep inside Taliban and al-Qaeda-occupied areas of FATA to collect information. Most of the areas are not accessible to journalists. Between last November and January [the think tank] sent five teams, each made up of five researchers, to the parts of the FATA that are often hit by American drones, to conduct a survey of public opinion about the attacks. The team visited Wana (South Waziristan), Ladda (South Waziristan), Miranshah (North Waziristan), Razmak (North Waziristan) and Parachinar (Kurram agency).

According to the email, one of the conclusions of the survey was that the notion that a large majority of the local population supports the Taliban is inaccurate. Further, the sender of the email stated his personal view that the majority of the residents of the FATA saw the enemy as the Taliban and al Qaeda and viewed the drone attacks as not violating the sovereignty of Pakistan.

20

53.   HEADLEY's sharp response confirmed that he had been to the area occupied by the

Taliban and al Qaeda.  HEADLEY stated:

> This "survey" is the biggest crock of S ... **I was there on some business recently
> and I assure you this dude is not even close** .. I even doubt the ability of the
> surveyors to conduct this "research" in Miranshah or **Razmak.**[4]  I even challenge
> [the identified individual who posted the survey article] to just walk around the
> bazaar in Miranshah.  This bazaar is bustling with Chechens, Uzbeks, Tajiks,
> Russians, Bosnians, some from EU countries and of course our Arab brothers.
> According to MY survey the foreign population is a little less than a third of the
> total. **Any Waziri or Mehsud I spoke to seemed grateful to God for the
> privilege of being able to host the "Foreign Mujahideen."**

(Emphasis supplied)

54.   On or about June 11, 2009, HEADLEY returned to Chicago.

### HEADLEY's Concern Regarding Individual A's Arrest

55.   In or around mid Summer 2009, HEADLEY became aware that Pakistani authorities had

detained Individual A. In that time frame, HEADLEY emailed a contact living in

Pakistan.  The subject of the mail read "[Individual A]?" and I understand HEADLEY

indicated in this email that Individual A had been arrested, and that HEADLEY wished to

know whether Individual A would be available to continue working with HEADLEY and

HEADLEY's associates.

### Lashkar-e-Taiba Shifts its Focus From Denmark to Potential New Attack in India

56.   In July and August 2009, HEADLEY exchanged a series of emails with an individual that

HEADLEY later identified to FBI agents as Lashkar-e-Taiba Member A.  Certain of these

emails are summarized below.

-----

[4]      As mentioned above in paragraph 26, news accounts after Kashmiri's reported
death noted that he had established a training camp in the Razmak region of Waziristan.

57.     On July 3, 2009, Lashkar-e-Taiba Member A sent HEADLEY an email in which Lashkar-e-Taiba Member A said, "i need to see you for some new investment plans."

58.     On July 8, 2009, HEADLEY sent Lashkar-e-Taiba Member A an email which stated, in part: "What do you want me to do. Where are you interested in making investments."

59.     In another email on July 8, 2009, HEADLEY told Lashkar-e-Taiba Member A that "I think when we get a chance we should revisit our last location again and say hi to Rahul." Following his arrest, HEADLEY acknowledged that, in this email, "Rahul" refers to a prominent Indian actor with the first name "Rahul."

60.     Lashkar-e-Taiba Member A replied to the above email on July 8, 2009 and told HEADLEY in an email that "to see rahul is a good idea coz have some work for you over there too. Matters are good enough to move forward...."

61.     On July 9, 2009, HEADLEY responded:

    When you say "move forward" do you mean in the North direction or towards Rahul. Also in the future if we need to meet to discuss anything, do i have to come all the way over there or can we meet somewhere in the middle like Africa or middle east."

62.     The same day, Lashkar-e-Taiba Member A responded that "i mean towards rahul."

63.     On July 10, 2009, HEADLEY sent an email to Lashkar-e-Taiba Member A in which he stated:

I would like to know a few things if you can tell me:
    1) What is the status with the Northern project, is it still postponed indefinitely?
    2) The visit to Rahul's place, is it for checking out real estate property like before, or something different and if so tell me what you can please. Also is it exactly in Rahul's city or different one?
    3) How long do you think i will need to stay at Rahuls place to complete this task.
    4) Will i have to stay there continuously for a while, or back and forth like before.

64. Based on my review of this and other communications, I believe that HEADLEY had inquired of Lashkar-e-Taiba Member A whether the Denmark project was on hold, and whether the visit to India that Lashkar-e-Taiba Member A had asked him to undertake was for the purpose of surveilling targets for a new terrorist attack. Later on July 10, 2009, Lashkar-e-Taiba Member A responded to HEADLEY's email, stating, in part, that: "There are some investment plans with me, not exactly at Rahul's city but near that.rest we can decide when meet according to your ease".

65. In an email to Lashkar-e-Taiba Member A on July 16, 2009, HEADLEY stated, in part: "One very important thing I need to know please is that how long do you need me for, meaning how long should it take me to finish my work, in your opinion. And is it really urgent? Before it seemed that the Northern Project was really urgent."

66. After Lashkar-e-Taiba Member A responded on July 18, 2009, that "it may take somewhere between 2 to 4 weeks," HEADLEY replied on July 19, 2009, that "I think i can manage it," and that he would be available in October. He closed his email by asking "Is the Northern Investment definitely postponed for now?" Lashkar-e-Taiba Member A and HEADLEY continued to exchange emails through late August 2009, when HEADLEY told Lashkar-e-Taiba Member A that he "will be there end of next month."

67. I understand these emails to reflect that beginning in July 2009, Lashkar-e-Taiba Member A was placing a higher priority on using HEADLEY to assist in planning a new attack in India than on completing the planned attack in Denmark. After this time, it appears that HEADLEY and Individual A continued the planning of an attack with Kashmiri, rather than Lashkar-e-Taiba.

23

**HEADLEY's Visit to Overseas Locations and Second Visit to Copenhagen**

68.     On or about July 26, 2009, HEADLEY traveled to Europe, visiting various countries en
route to Copenhagen, Denmark. As described further below, during HEADLEY's second
visit to Copenhagen, HEADLEY took surveillance video of several locations in
Copenhagen Denmark, including the office of the *Jyllands-Posten* in King's Square in
Copenhagen.

69.     On or about August 5, 2009, HEADLEY arrived in Atlanta, Georgia, on a flight from
Copenhagen, Denmark. An officer with Customs and Border Patrol interviewed
HEADLEY upon his entry. HEADLEY stated that he traveled to Copenhagen, Denmark,
and elsewhere in Europe for business. HEADLEY claimed to be a consultant for an
immigration business. An examination of HEADLEY's luggage revealed no papers,
flyers or any documents relating to such business.

**HEADLEY's Conversation With Individual A After Second Copenhagen Visit**

70.     Following his return from his second visit to Copenhagen, HEADLEY received an email
in response to his inquiry about the arrest of Individual A, described in paragraph 55
above. The sender wrote, "your friend that u asked about has reached home yesterday.
How r u and what r the plans?" HEADLEY replied to the email and stated "thank you. I
spoke with him after his arrival."

71.     I understand that when HEADLEY indicated that he "spoke with him after his arrival,"
HEADLEY was referring to Individual A. Phone records for Headley's cell phone reveal
a call the day before he received the above referenced email with a Pakistani phone
number.

### HEADLEY Communications With Lashkar-e-Taiba Member A
### Regarding Copenhagen

72.    Following his return from his second visit to Copenhagen, HEADLEY exchanged emails

with Lashkar-e-Taiba Member A, regarding, among other topics, his trip to Copenhagen.

On or about August 7, 2009, Lashkar-e-Taiba Member A sent an email asking

HEADLEY why he had not been responding.  That same day, HEADLEY responded:

> Sorry, I just don't check my mail daily if I don't expect anyone will write me.  I
> am working at a retaurant [sic] owned by [a named associate of Headley's] **and
> his friend** as a manager.  Last week they sent me to Germany to buy some
> Butchery equipment and guess where else I went for 3 days (just for a vacation :) .
> . .

(Emphasis supplied).  I understand that in this message HEADLEY is referring to his

recently completed trip to Copenhagen (inaccurately referenced in the email as Germany)

as a "vacation," the same term that he used in his January 23, 2009 email during his first

trip to Denmark.

73.    On or about August 9, 2009, Lashkar-e-Taiba Member A responded in pertinent part:

> God ..........You are something... how was visit? Did you buy some thing for me? I
> heard that [names an associate of Headley and Lashkar-e-Taiba member A] is
> with haroon.so be carefull "please"

I understand the statement that [the associate] is "with haroon" is a reference to this

associates's arrest by Pakistani authorities, and the continued detention of Major Haroon

by Pakistani authorities.  Months before August 2009, Pakistani news reports stated that

Haroon had confessed to his role in the murder of General Alvi and provided information

about Kashmiri's operations.  In fact, on or about April 14, 2009, HEADLEY had posted

an article to the "abdalians" Yahoo group regarding Haroon.  The article stated in

25

pertinent part that Haroon "confessed that he had assassinated General Alvi," and confessed that he had kidnaped four separate victims in order to get money for militant organizations.

74. HEADLEY and Lashkar-e-Taiba Member A continued their exchange about the travel to Copenhagen. The following are the pertinent excerpts from their continued exchange:

> (HEADLEY, August 10, 2009)
> Yes, we bought some abbatoir [animal butchery] equipment from there. I did get you something. The same gift I got for you last time I was there. . . .
>
> (Lashkar-e-Taiba Member A, August 11, 2009)
> . . .what ever i am saying, i know deep in my heart is futile.coz its YOU. . . .
>
> (HEADLEY, August 11, 2009)
> I don't understand, what is futile?
>
> (Lashkar-e-Taiba Member A, August 11, 2009)
> futile are my advices, coz you do what you feel like. matter and situation is not clear . . . . .your skin is dear to me, more than my own

I understand that, in the above exchange, HEADLEY is reporting on his travel and the fact that he has additional video surveillance for Lahkar-e-Taiba member A, and Lashkar-e-Taiba Member A is recommending that HEADLEY be careful and expressing some frustration because HEADLEY does not always follow advice.

### HEADLEY and Individual A Discuss
### Whether Kashmiri Has Received a Report Regarding Their Plans

75. Throughout the remainder of August and early September 2009, a number of intercepted telephone conversations between HEADLEY and Individual A reveal that HEADLEY continually sought word of whether Individual A had been in contact with Kashmiri regarding their plans.

76.    On or about August 22, 2009, HEADLEY and Individual A spoke by telephone.  The

pertinent discussion was as follows:

HEADLEY:    First tell me have you spoken to Doctor[5]

Individual A:  No friend -- there is nothing.

HEADLEY:    Contact.

Individual A:  Nowadays, there is no contact..

* * *

HEADLEY:    . . . about discussion with Mister Doctor, that if this doesn't -- for example
            -- along these lines you should, you should consider that -- . . .these who
            are coming to meet --

Individual A:  Hmm

HEADLEY:    -- if they -- example what you people had thought about them -- in doubt --
            if they are not fulfilling on it --

Individual A:  Hmm

HEADLEY:    Then B, B, there should be something as a B, option B.

Individual A:  Okay.

HEADLEY:    Yeah.

Individual A:  On the contrary, on the contrary, not B, but there should be B and C as
            well.

---

[5]    From my review of intercepted communications between HEADLEY and
Individual A, I believe that the use of the term "Doctor" in this particular context is to refer to
Kashmiri.

27

HEADLEY:       Yeah, there should be B and C as well. So that's why – about it – Ahm –
               okay secondly I – that – used to make an email – I mean, you, you could
               write on it every now and then.[6]

Individual A:  Okay, yes, yes, yes.

HEADLEY:       So that, I, I mean, had made one more, and I will give it to you sometime –
               we can do on it too

Individual A:  Okay

HEADLEY:       So, about, so think about it. Because I have a return ticket for October
               29th, for there, to return.[7]

Individual A:  O, okay

HEADLEY:       Where I came from, recently.

Individual A:  Yes, yes, yes.

HEADLEY:       So for now, do it, delay it, give priority or put at the end, what is its
               arrangement. And secondly, I also said that to you, that also find out, that
               if, that, I mean that, what I told you, that –

Individual A:  Yes, yes, that, I –

HEADLEY:       Yeah.

Individual A:  – that, understand, I understand.

77.    I understand that, in the above conversation, HEADLEY discussed developing other

options ("B" and "C") if communications with the "doctor" failed or if the "doctor" and

---

[6]       As discussed previously, on or about August 28, 2009, in a telephone
conversation between HEADLEY and Individual A, HEADLEY spoke in coded language to
describe a new email account created by HEADLEY. HEADLEY and Individual A, in fact, had
at least three separate conversations regarding this account, based, in part, on Individual A's
confusion over how HEADLEY spelled the names of the persons used to create the account.

[7]       HEADLEY has a return ticket to Copenhagen for October 29, 2009. HEADLEY
is scheduled to depart at about 6:15 p.m. on a Delta flight from Atlanta to Copenhagen.

his people were otherwise unable to assist in the activity ("if they are not fulfilling on it").

As to option "B," HEADLEY further commented:

Individual A: You, you have invested in the business, after that you must show some patience, which is necessary.

HEADLEY: **I like the option B. I can do it on my own that is it.** I do not need help of anyone else. I on my own. I am qualified I have studied accounting. I have taken two semesters in college. I can do accounting myself, I can do marketing myself. I do not need anybody's help. The salary that you will give to someone I take it myself. **And I can do it myself, easily, with no problem at all.**

Individual A: I see.

HEADLEY: Yeah.

(Emphasis supplied). I understand that in this conversation, HEADLEY told Individual A that he would make himself available to perform their planned operation.

78. On or about September 3, 2009, HEADLEY and Individual A spoke by telephone. HEADLEY inquired whether Individual A had found out anything, and Individual A responded negatively. In discussing this further, HEADLEY related words to the effect that, ever since his return, he has "wanted this project from the bottom of his heart."

79. On or about September 5, 2009, HEADLEY and Individual A spoke by telephone, and Individual A reported that he had not heard any word from "Doctor," and HEADLEY expressed concern that things might have to be "continued" until they receive an answer. In pertinent part, the conversation was as follows:

Individual A: However, I wanted to tell you that nothing is happening about that - for that, God willing, I will tell you later, okay?

HEADLEY: Right. Ah, unable to find out, anything about that?

29

Individual A:  Yes, dear. Nothing – absolutely nothing – from there, just, ah, anyway, I will get it from there. It, it, it, it is very quiet now.

HEADLEY:  But, but have, haven't you had any contact with the doctor yet? You should contact Doctor.

Individual A:  No, no, no, absolutely nothing – unable to find out anything, at this time.

HEADLEY:  So, if, if you are unable to contact – then, then, then, in that case, it needs to be continued until receive an answer from there, right?

Individual A:  No, no, no, I can do it – but still waiting for an answer. Going to wait for a little while. It is absolutely quietness over there. There is absolutely nothing, from anything like that.

80.  On or about September 7, 2009, HEADLEY and Individual A again spoke by telephone.

After HEADLEY asked Individual A to tell him something new, Individual A responded

words to the effect of "nothing has been happening from there" and that he was "unable

to find out anything about that." Thereafter, the following exchange occurred:

HEADLEY:  .... **anyhow, then you need to tell him everything, whatever I told you.** Didn't you convey him everything whatever I had told you, about him? Or still, it has not been conveyed to him at all?

Individual A:  No. There is absolutely nobody. Look, from there, from there, ah, it, that is, has been, ah, it has been completely cut off.

HEADLEY:  But, ah – it is okay, never mind.

Individual A:  No, unable to find it out. On, on that, that day, it is not like I am just sitting here. I, I am trying my best for it.

HEADLEY:  Right.

Individual A:  That is –

81.  Based on my review of the above recording, as well as other recorded conversations,

described below between HEADLEY and Individual A, I understand from the above

30

conversation that HEADLEY wanted to ensure that "Doctor" received the information HEADLEY had passed on to Individual A.

### Individual A Reports Death of Ilyas Kashmiri

82.     On September 13, 2009, at 4:56 p.m., following limited press reports from a week earlier that Ilyas Kashmiri may have been killed in a drone attack in the FATA area of Pakistan, a telephone call took place between HEADLEY in Chicago, Illinois, and Individual A in Pakistan. During the telephone call, Individual A told HEADLEY in code that Kashmiri might be dead: he stated that the "doctor" may have "gotten married there" but that there was no confirmation. HEADLEY seemed surprised and said that he had not seen it on the news. Individual A mentioned that "maybe" it was in the "print media," and instructed HEADLEY to "search in there [print media]." During that same telephone call, HEADLEY later stated, "so it means, our company has gone into bankruptcy then," and "the **projects** and so forth will go into suspension for the time being." (Emphasis supplied). Individual A responded words to the effect of "no, no, why? **Projects** will continue." (Emphasis supplied). Although this conversation was mainly in the Urdu language, both HEADLEY and Individual A used the English word "projects."

83.     Almost immediately following the conclusion of the telephone call during which Individual A instructed HEADLEY to "search" the "print media," HEADLEY conducted a "google" search of "Ilyas Kashmiri." (The September 13 telephone call began at 4:56 p.m. Chicago time and ended at 5:09 p.m. The "Ilyas Kashmiri" search took place approximately 3 minutes later at approximately 5:12 p.m.) Following his arrest, HEADLEY confirmed that the discussion of the "marriage" of the "doctor" "over there"

31

during the above-described telephone calls was not a reference to a wedding but instead was a reference to the reported death of Ilyas Kashmiri.

84. On September 16, 2009, HEADLEY again performed a google search for "Ilyas Kashmiri" at approximately 7:29 p.m. On that date, a new press report had appeared online indicating that Ilyas Kashmiri had been killed on September 14, 2009, in a drone attack while a different terrorist had been killed in a separate drone attack the week before. Thus, the report indicated that the killing of Kashmiri would have taken place the day after Individual A had told HEADLEY that Kashmiri had already been killed.

85. On September 17, 2009, at 2:17 a..m., HEADLEY spoke to Individual A by telephone and appeared to relay this development in a coded conversation. HEADLEY stated that: "it is everywhere now . . . that their marriage has been confirmed." But HEADLEY noted that Individual A told him "four or five days ago but these guys are saying that it is only a two or three days old matter." Individual A responded, "No – yeah – it happened again one or two days ago." As HEADLEY confirmed subsequent to his arrest, the conversation also made clear that "property," "investments" and other business terms were used as coded terms for violent actions. In apparent reference to the drone strikes that killed Kashmiri and others, HEADLEY related that "there is some sort of arrangement that very accurate -- I mean that of these guys -- the estimates of all of them are so accurate . . . The estimate -- whatever **assessment** they do for any **property** is always accurate, so that have very . . . a discerning eye, a very discerning eye on the market. . . . There was their picture also. They were giving their picture also, of the bride

32

and the bridegroom." (Emphasis supplied.)[8] (Press reports at the time had pictures of Kashmiri and another person believed to have been killed in the attack.) HEADLEY also stated that he would be coming to Pakistan soon "but now there is nothing to do there. Now let us collect unemployment from the company . . . when a company lays off in case of bankruptcy, it discharges employees." When Individual A tried to assure Headley that Kashmiri's death was a "small loss," HEADLEY disagreed and responded: "no, it is not a small loss, it is a major loss."

86.     In this same conversation, HEADLEY told Individual A that in light of Kashmiri's reported death, "Now I think you better go back towards him, towards [Lashkar-e-Taiba Member A]." HEADLEY complained to Individual A that "[Lashkar-e-Taiba Member A] and others, and this [an identified individual] and all of them – again they are – their eyes are again in that direction." He added that Lashkar-e-Taiba Member A and the identified individual were unwilling to take risk and "have rotten guts." Individual A said, "when in business a person wants to do something, there is risk factor also. They do not want to take risk and they want to be praised also." HEADLEY responded, "then there will be no profit because when you have high aim, as much an investment will be risky as much is the chance of profits and at the same time there is chance of loss."

87.     In the same telephone conversation, Individual A stated that "This is business sir these type of things happen." HEADLEY responded that "I am just telling you that the companies in your competition they have started handling themselves in a far better way

---

[8]     Although this conversation was mainly in the Urdu language, the words "assessment" and "property" were spoken in English.

that is why they all are running in losses profit-wise and market-wise. There are continuous losses and it does not seem that they will recover. In these conditions it looks that there will be bankruptcy in approximately six months, my estimate within . . . six to twelve months is that our companies will be done the way things are going on." Individual A responded, "it is as it usually happens that if one company fails then another company will come up."

88.     Later that same evening, on or about September 17, 2009, HEADLEY spoke to a family member by telephone. The family member related to HEADLEY that the cleric that HEADLEY went to see passed away, and asked if HEADLEY had confirmed it with a Individual A. HEADLEY responded words to the effect that Individual A confirmed it five, six days ago and said that the cleric died of a heart attack. HEADLEY further related that he was very sad and upset about the death. Two days later, on or about September 19, 2009, HEADLEY again spoke by telephone with this same family member. HEADLEY asked this family member if he had learned anything about "doctor," and stated words to the effect of: ""[h]e was you Pir Sahib [spiritual guide], where I and you went, we went to Samanabad and we did Baiat [an oath of allegiance]." After the family member responded, "[y]es sir, absolutely, absolutely," HEADLEY continued "he just had a heart attack . . .it has made me very sad." Based on my review of these recorded conversations, and the earlier recorded conversations between HEADLEY and Individual A, I understand that the "cleric" to whom they are referring is the "Doctor," Kashmiri. I understand that the "heart attack," similar to the term "married," is code for the fact that Kashmiri was killed. I further understand that

HEADLEY is discussing a visit to Kashmiri when he swore an oath of allegiance to Kashmiri.

89.    On or about September 20, 2009, HEADLEY spoke with a different family member in a recorded telephone conversation. Following a discussion about an individual who had experienced a sudden "heart attack" (a term which HEADLEY used in other contexts to refer to Kashmiri's reported death), HEADLEY related words to the effect "that the main thing is the business must go on." HEADLEY continued, "main thing that I have an income...make some money. I don't care that if I am working for Microsoft or I am working for a...any...GE or Philips, I don't care. As long as I am making money, I don't give a shit." Based on my review of this and other conversations involving HEADLEY, I believe that HEADLEY is indicating that he does not care whether he works for Kashmiri's group or Lashkar-e-Taiba, as long as he helps carry out attacks.

**HEADLEY and Individual A Discuss News that Kashmiri Might be Alive**

90.    On or about September 21, 2009, HEADLEY spoke with Individual A by telephone:

Individual A:  Buddy, the reports that are com-coming in, by the grace of God, he is doing well.

HEADLEY:   God willing -- uh, uh -- you mean the Doctor?

Individual A:  Yes, yes.

HEADLEY:    Uh, I, Buddy if this is true, then I will say 100 prayers, 100 prayers.

91.    In this same telephone conversation, HEADLEY again referred to the earlier news about Kashmiri, this time using the terms "Pir" and "heart attack," the same terms that HEADLEY used to describe Kashmiri and his reported death to his relative, as discussed

35

above, and about Kashmiri, stated that "there were some more stories published about him – that – about whom we were thinking that didn't, didn't reach the completion stage – the **investments,** etc." (Emphasis supplied) HEADLEY, in fact, had performed additional google searches of "Ilyas Kashmiri" and accessed a number of news articles relating to the terrorist activities of Kashmiri. In the same conversation, HEADLEY continued, "it's quite a detailed writing . . .there was a lot of praise, there was a lot of praise for him – what we call praise."

92. On or about September 30, 2009, HEADLEY and Individual A again spoke by telephone. Individual A informed HEADLEY that "Pir Sahib" is "absolutely all right." HEADLEY asked Individual A to "swear" several times, and Individual A responded "I swear, I am telling the truth." HEADLEY added, "so he does not get married," and asked "so, then, I will be able to meet him upon returning." Individual A responded words to the effect of "absolutely, right, and he – just today – just today, was asking about you." Based on my review of this conversation, as well as preceding conversations, I believe that the reference to "Pir Sahib" is Kashmiri.

93. Based on intercepted conversations with family members and other third parties, HEADLEY intended to travel to Pakistan in early October 2009. Before doing so, HEADLEY intended to travel to Philadelphia from Chicago. On or about September 8, 2009, HEADLEY received an email confirmation from Orbitz, an online travel agency, reflecting the purchase of airfare from Chicago to Philadelphia on October 3, 2009.

94. On October 3, 2009, HEADLEY was arrested at O'Hare Airport in Chicago before boarding his scheduled flight to Philadelphia. Agents searched his checked luggage

36

pursuant to a search warrant issued by United States Magistrate Judge Arlander Keys on

October 2, 2009. Among other items recovered from HEADLEY's checked luggage was

(1) a photocopy of the front page of an August 1, 2009 issue of the *Jyllands-Posten*, (2) a

street guide for Copenhagen, Denmark, (3) a list of phone numbers, including a Pakistani

telephone number HEADLEY had used to contact Individual A, and (4) a book entitled

"How to Pray Like a Jew."[9] Also contained in the luggage was a memory stick, the

contents of which agents viewed with written consent from HEADLEY. Contained on

this memory stick were approximately ten short videos, including videos taken of King's

Square both during the day and at night. The daytime video of King's Square includes

close-up shots of the entrance to the *Jyllands-Posten* office. The videos also include

shots of what appears to be the entrance to a military barracks, a close-up of a guard

---

[9]      As mentioned in paragraph 20 above, HEADLEY was tasked with performing surveillance of a synagogue in Denmark that Lashkar-e-Taiba Member A believed to be attended by the cultural editor of the newspaper.

37

stationed near the entrance to that location, and of the exterior and interior of

Copenhagen's central train station.

Lorenzo Benedict
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN
before me this _11th_ day of October, 2009

ARLANDER KEYS
UNITED STATES MAGISTRATE JUDGE

38