UNITED STATES DISTRICT COURT **FILED**
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAR 1 8 2010
~~Mar 1 8 2010~~
JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

UNITED STATES OF AMERICA )
)
)   No. 09 CR 830-3
vs. )
)   Judge Harry D. Leinenweber
DAVID COLEMAN HEADLEY )
a/k/a "Daood Gilani" )

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant DAVID COLEMAN HEADLEY, and his attorneys, JOHN T. THEIS and ROBERT SEEDER, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(B), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.     The Superseding Indictment in this case charges defendant in twelve counts: Count One, which charges defendant with conspiracy to bomb places of public use in India, including, but not limited to, the conduct which led to the attacks on places of public use in Mumbai, India, from November 26 to 28, 2008, in violation of Title 18, United States Code, Section 2332f(a)(2); Count Two, which charges defendant with conspiracy to murder and maim persons in India, in violation of Title 18, United State Code, Section 956(a)(1); Counts Three through Eight, which charge defendant with aiding and abetting the murders of six United States nationals in Mumbai, India, in violation of Title 18, United States Code,

Section 2332(a)(1); Count Nine, which charges defendant with conspiracy to provide material support to terrorism in India, in violation of Title 18, United States Code, Section 2339A; Count Ten, which charges defendant with conspiracy to murder and maim persons in Denmark, in violation of Title 18, United States Code, Section 956(a)(1); Count Eleven, which charges defendant with conspiracy to provide material support to terrorism in Denmark, in violation of Title 18, United States Code, Section 2339A; and Count Twelve, which charges defendant with providing material support to *Lashkar e Tayyiba* in violation of Title 18, United States Code, Section 2339B.

3.     Defendant has read the charges against him contained in the Superseding Indictment, and those charges have been fully explained to him by his attorneys.

4.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charges to Which Defendant is Pleading Guilty

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to all counts of the Superseding Indictment, as previously described in Paragraph 2 above.

## Factual Basis

6.     Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One through Twelve of the Superseding Indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline §1B1.3:

2

a. With respect to Count One of the Superseding Indictment:

Beginning no later than in or about late 2005, and continuing through on or about October 3, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere within and without the jurisdiction of the United States, defendant conspired with members of *Lashkar e Tayyiba*, including but not limited to individuals identified herein as *Lashkar* Members A, B, C and D, and others, to deliver, place, discharge and detonate explosives and other lethal devices in, into and against places of public use, state and government facilities, public transportation systems, and infrastructure facilities in India, with the intent to cause death and serious bodily injury, and with the intent to cause extensive destruction of such places and facilities which such destruction would likely result in major economic loss, and defendant was a national of the United States and was found in the United States.

More specifically, in or around late 2005, defendant met with three individuals herein identified as *Lashkar* Members A, B and D, and received instructions to travel to India to conduct surveillance of various locations in India, including places of public use, and state and government facilities. Prior to receiving these orders, defendant had attended training camps organized and operated by *Lashkar e Tayyiba* on five separate occasions in or around 2002 through 2005. Starting in or around February 2002, defendant attended a three-week course and received indoctrination on the merits of waging jihad. Starting in or about August 2002, defendant attended a three-week course and received training in, among other skills,

3

the use of weapons and grenades. Starting in or about April 2003, defendant attended a three-month course and received training in various skills, including, but not limited to, close combat tactics, the use weapons and grenades, and survival skills. Starting in or around August 2003, defendant attended a three-week course and received training in, among other skills, counter-surveillance. Starting in or around December 2003, defendant attended an approximately three month course and received combat and tactical training. On multiple occasions, following his completion of the above-described training courses, defendant advised co-defendant TAHAWWUR HUSSAIN RANA ("RANA") of his membership in *Lashkar e Tayyiba* and the training that he had received.

In or around February 2006, in order to facilitate his activities on behalf of *Lashkar* by portraying himself in India as an American who was neither Muslim nor Pakistani, defendant changed his name from "Daood Gilani" to "David Coleman Headley" in Philadelphia, Pennsylvania. Thereafter, in or around the early summer of 2006, defendant met with *Lashkar* Members A and D, and discussed opening an immigration office in Mumbai, India, as cover for his surveillance activities. On several occasions prior to this meeting, defendant had advised *Lashkar* Members A and D of his friendship with co-defendant RANA, and RANA's ownership and operation of First World Immigration, an immigration services business located in Chicago and other locations.

In or around June 2006, defendant traveled to Chicago and met with co-defendant RANA. Defendant advised co-defendant RANA of his assignment in India, and explained

that opening an office for First World Immigration would provide a cover story for his activities. Following defendant's explanation, RANA agreed to open an immigration office in Mumbai, India, and provide assistance to defendant's activities. At co-defendant RANA's direction, an individual associated with First World prepared documents to support defendant's cover story. RANA further advised defendant on how to obtain a visa for his travel to India. In applying for this visa, defendant misrepresented his birth name, his father's name and the true purpose of his travel to India.

*Surveillance Trips*

After receiving RANA's approval, defendant traveled back to Pakistan and met with *Lashkar* Members A and D, among others, on several occasions. Defendant advised them that RANA had agreed to the use of First World Immigration as cover for his activities. Defendant also showed them the visa that he had obtained with RANA's assistance. During these meetings, defendant received additional instructions regarding his intended travel to India.

Defendant thereafter traveled to India in or around September 2006, using the opening and operation of RANA's immigration business as cover for defendant's travel to and extended stay in Mumbai, India. During this trip, defendant conducted extensive video surveillance of various locations in India, including, but not limited to, the Taj Mahal Hotel. After this trip, defendant met in Pakistan with various co-conspirators, including but not limited to members of *Lashkar e Tayyiba,* provided them with the video recordings he had

5

made and discussed with the co-conspirators the video and the surveillance he had conducted. Further, defendant received instructions to return to Mumbai and perform additional surveillance.

In or around February 2007, defendant returned to Mumbai and conducted video surveillance of various locations, including, but not limited to, extensive video of the second floor of the Taj Mahal Hotel in Mumbai, India. After this trip, defendant again met in Pakistan with various co-conspirators, including but not limited to members of *Lashkar e Tayyiba*, provided them with the video recordings he had made and discussed with the co-conspirators the video and the surveillance he had conducted.

In or around June 2007, defendant traveled to Chicago and met with co-defendant RANA. Defendant advised RANA of the surveillance work that he had performed in Mumbai, including the video taken at the Taj Mahal Hotel. Defendant further advised RANA about his meeting with co-conspirators and their reaction to the surveillance work that defendant had performed.

Following defendant's return to Pakistan, defendant was instructed to return to Mumbai. In or around September 2007, defendant returned to Mumbai and conducted additional surveillance, as instructed. After returning to Pakistan, defendant again met with various co-conspirators, including but not limited to members of *Lashkar e Tayyiba*, provided them with the video recordings he had made and discussed with the co-conspirators the video and the surveillance he had conducted.

6

In or about March 2008, defendant met with co-conspirators in Pakistan and discussed potential landing sites in Mumbai for a team of attackers that would arrive by sea. Following this discussion, defendant was ordered to return to Mumbai to perform additional surveillance and locate possible landing sites. In or around April 2008, defendant returned to Mumbai with a global positioning system ("GPS") device and performed the surveillance, including taking boat trips in and around the Mumbai harbor and entering locations in the GPS device. After returning to Pakistan, defendant again met with various co-conspirators, and, among other things, advised them of his recommendations as to potential landing sites. During these meetings, defendant learned that attack plans were being delayed, in part, to wait for when the sea was calmer.

At around the end of April 2008, defendant traveled to the United States for about six weeks. Over the course of a few days in or around the end of May 2008, defendant met with co-defendant RANA in Chicago. Defendant advised RANA about the extensive surveillance that he had conducted in Mumbai and the meetings that he had with various co-conspirators. Defendant related to RANA the landing ideas and, in particular, the idea of one co-conspirator that the team of attackers land in front of the Taj Mahal Hotel. Defendant further told RANA about the boat trips in and around the Mumbai harbor and defendant's use of the GPS device. Defendant informed RANA that the attack plans were being delayed, in part, to wait for calmer waters.

7

During discussions over the course of approximately five days in or around May 2008, defendant also advised RANA of the surveillance that he had conducted in other locations in India. Further, defendant informed RANA of the request by one co-conspirator for defendant to conduct additional surveillance activities in Delhi, and discussed opening an office for First World Immigration in Delhi as cover for such activities.

After returning to Pakistan, defendant met with various co-conspirators and received instructions to return to Mumbai and conduct surveillance of various locations. In or around July 2008, defendant returned to Mumbai and conducted extensive video surveillance of various targets, including but not limited to the Taj Mahal Hotel, the Oberoi Hotel, the Chabad House, the Chhatrapati Shivaji Terminus train station, the Leopold Café, as well as potential landing sites for the team of attackers. After this trip, defendant again met several times in Pakistan with various co-conspirators, including but not limited to members of *Lashkar e Tayyiba*, provided them with the video recordings he had made and discussed with the co-conspirators the video and the surveillance he had conducted.

In addition to these meetings, defendant met with *Lashkar* Member A on several occasions and at several locations. *Lashkar* Member A advised defendant of a number of details concerning the planned attacks, including that a team of attackers was being trained in a variety of combat skills, the team would be traveling to Mumbai by sea and using the landing site recommended by the defendant, the team would be fighting to the death and would not attempt to escape following the attacks, the Chhatrapati Shivaji Terminus train

8

station would be one target of the attacks, and the team would be using a GPS device and remain in telephonic contact with *Lashkar* Member A during the attacks.

### The Mumbai Attacks

In late November 2008, ten co-conspirators trained by *Lashkar e Tayyiba* carried out assaults with firearms, grenades and improvised explosive devices against multiple targets in Mumbai, India, including attacks on the Taj Mahal hotel; the Oberoi hotel; the Leopold Cafe; the Nariman House and the Chhatrapati Shivaji Terminus train station, killing approximately 164 people and wounding hundreds more.

### Other Surveillance in India

In addition to the surveillance performed on the five separate trips described above, defendant traveled to India in or about March 2009 to conduct additional surveillance. Among other locations, defendant conducted surveillance of the National Defense College in Delhi, India, and of Chabad Houses in several cities in India.

      b.    With respect to Count Two of the Superseding Indictment:

Beginning no later than in or about late 2005, and continuing through on or about October 3, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere within and without the jurisdiction of the United States, defendant conspired with *Lashkar* Members A, B, C, and D, and others, to commit acts outside the United States that would constitute the offenses of murder and maiming if committed in the special maritime and territorial jurisdiction of the United States, namely, murder and maiming in connection

with attacks carried out by *Lashkar e Tayyiba* in India. As described in subparagraph (a), defendant agreed to assist members of *Lashkar e Tayyiba* to prepare for carrying out the November 2008 attacks in Mumbai, which killed approximately 164 persons and wounded hundreds more.

        c.      With respect to Counts Three through Eight of the Superseding Indictment:

On or about the dates listed below, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere within and without the jurisdiction of the United States, defendant aided and abetted the murders in Mumbai, India of the following United States nationals: Ben Zion Chroman (November 26, 2008), Gavriel Holtzberg (November 27, 2008), Sandeep Jeswani (November 26, 2008), Alan Scherr (November 26, 2008), Naomi Scherr (November 26, 2008) and Aryeh Leibish Teitelbaum (November 27, 2008). As described in subparagraph (a), defendant agreed to assist members of *Lashkar e Tayyiba* to prepare for carrying out the November 2008 attacks in Mumbai, during which the team of *Lashkar e Tayyiba* attackers killed these six United States nationals.

        d.      With respect to Count Nine of the Superseding Indictment:

Beginning no later than in or about late 2005, and continuing through on or about October 3, 2009, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant conspired with co-defendant RANA and others to provide material support or resources, and to conceal and disguise the nature, location, source and ownership

of such support and resources, knowing and intending that they were to be used in the preparation for, and in carrying out, violations of Title 18, United States Code, Section 2332f and 956(a)(1). More specifically, defendant provided personnel, namely himself, when he worked under the direction and control of members of *Lashkar e Tayyiba* to prepare for carrying out the November 2008 attacks in Mumbai, which killed approximately 164 persons and wounded hundreds more.

   e. With respect to Counts Ten and Eleven of the Superseding Indictment:

  In or about early November 2008, defendant met with *Lashkar* Member A in Karachi, Pakistan, and was instructed to travel to Denmark to conduct surveillance of the Copenhagen and Aarhus offices of the Danish newspaper *Morganevisen Jyllands-Posten* (the "*Jyllands-Posten*"), in preparation for an attack on the newspaper in retaliation for its publication of cartoons depicting the Prophet Mohamed. Following this meeting, defendant informed co-defendant ABDUR REHMAN HASHIM SYED ("Pasha") of his assignment. Pasha stated to defendant words to the effect that if *Lashkar* did not go through with the attack, Pasha knew someone who would. Although not identified by name at the time, defendant later learned this individual to be co-defendant ILYAS KASHMIRI. Pasha previously had stated to defendant that he had been working with KASHMIRI and that KASHMIRI was in direct contact with a senior leader for *Al Qaeda*.

  In or around December 2008, defendant met with *Lashkar* Member A and again discussed an attack on the *Jyllands-Posten* facility. More specifically, defendant and

11

*Lashkar* Member A discussed the scope of the attack.  When defendant suggested that they focus on those responsible, referring to killing the editor and cartoonist identified in the Superseding Indictment as Editor A and Cartoonist A, *Lashkar* Member A stated that "all Danes are responsible."  Shortly after this meeting, defendant returned to the United States.

In or around December 2008, defendant met with co-defendant RANA and, over the course of two or three discussions, advised RANA about his assignment to conduct surveillance of the *Jyllands-Posten* in Denmark, as well as the statement made by *Lashkar* Member A.  Defendant further advised RANA about his conversations with Pasha and Pasha's statement that he knew someone who would carry out an attack if *Lashkar* did not. In or around late December 2008 and early January 2009, defendant sent emails to, and received emails from, Pasha in order to continue planning for the attack and coordinate defendant's travel to Denmark. In or about early January 2009, defendant asked for RANA's approval and assistance to identify himself as a representative of First World Immigration, to falsely represent that First World was planning to open an office in Copenhagen, and to gain entry to the *Jyllands-Posten*'s office by falsely expressing an interest in placing an advertisement for First World in the newspaper.  RANA approved of the idea and agreed to provide assistance.  In or around January 2009, defendant and RANA had business cards made to identify defendant as an Immigration Consultant for the Immigrant Law Center, a business name for First World Immigration.

In or about January 2009, defendant traveled from Chicago, Illinois, to Copenhagen, Denmark, to conduct surveillance of the *Jylland Posten* offices in the cities of Copenhagen and Aarhus in Denmark. On or about January 20, 2009, defendant obtained entry to the office in Copenhagen on the pretext that he was seeking to place an advertisement on behalf of First World Immigration. Defendant also scouted and took extensive video surveillance of the area surrounding the Copenhagen office. While in Copenhagen, defendant provided one of the business cards which RANA and the defendant had made to a *Jylland Posten* employee. Because this card identified other business addresses for First World in New York and Canada, defendant sent an email to RANA asking him to contact those offices to make sure that if *Jylland Posten* employees contacted one of those offices, the First World employees at those locations would not blow defendant's cover.

On or about January 23, 2009, defendant obtained entry to the *Jyllands-Posten* office in Aarhus, again on the pretext that he was seeking to place an advertisement on behalf of First World in the newspaper. Defendant also scouted the area surrounding that office.

In or around late January 2009, defendant met separately with *Lashkar* Member A and Pasha in Pakistan concerning the planned attack on the newspaper and provided each with videos of his surveillance. At about the same time, Pasha provided to defendant a video produced by the media wing of *Al Qaeda* in or around August 2008. The video claimed credit for the June 2008 attack on the Danish embassy in Islamabad, Pakistan, and called for

13

further attacks against Danish interests to avenge the publication of the cartoons of the Prophet Mohamed.

In or around February 2009, defendant and Pasha met with co-defendant KASHMIRI in the Waziristan region of Pakistan. Defendant discussed with KASHMIRI and Pasha the video surveillance that defendant had taken in Copenhagen and ways in which to carry out the attack. KASHMIRI told the defendant that he (KASHMIRI) could provide manpower for the operation and that the participation of *Lashkar* was not necessary. After this meeting, in or around March 2009, *Lashkar* Member A advised defendant that *Lashkar* put the plans to attack the *Jyllands-Posten* on hold due to pressure on *Lashkar* resulting from the November 2008 attacks in Mumbai.

Thereafter, in or around May 2009, defendant and Pasha again met with KASHMIRI in Waziristan. KASHMIRI told the defendant that he had met with a European contact who could provide the defendant with money, weapons and manpower for the attack on the newspaper. KASHMIRI directed the defendant to meet with this European contact, and relate KASHMIRI's instructions that this should be a suicide attack and that the attackers should prepare martyrdom videos beforehand. Among other details, KASHMIRI stated that the attackers should behead captives and throw their heads out of the newspaper building in order to heighten the response from Danish authorities. KASHMIRI stated that the "elders," who defendant understood to be *Al Qaeda* leadership, wanted the attack to happen as soon as possible.

14

After this meeting, in or around early June 2009, defendant returned to Chicago. Defendant met with RANA on several occasions in or around June and July 2009. Defendant related what KASHMIRI had stated in the May 2009 meeting, including the details described in the above paragraph. In or around July 2009, defendant also provided to RANA, among other materials, the *Al Qaeda* video described above.

In or about late July and early August 2009, defendant traveled from Chicago, Illinois, to various places in Europe, including Copenhagen, Denmark, to conduct additional surveillance of the *Jyllands-Posten* newspaper office and surrounding area. In doing so, defendant took approximately 13 surveillance videos. Further, while in another location in Europe, defendant met with, and attempted to gain assistance from, KASHMIRI's European contacts. When returning to the United States on or about August 5, 2009, defendant falsely advised a Customs and Border Patrol inspector at an airport in Atlanta that he had visited Europe for business reasons related to First World.

Following his return to Chicago, defendant advised RANA in detail about his surveillance efforts in Copenhagen and his meeting with KASHMIRI's European contact. Defendant also spoke with Pasha by telephone and, using code, related some of the details relating to his surveillance and his meeting with KASHMIRI's European contact.

On multiple dates throughout the remainder of August and September, defendant communicated with RANA and Pasha concerning planning for the attack on the *Jyllands-Posten* and media reports that co-defendant KASHMIRI had been killed. On or about

15

October 3, 2009, defendant traveled to O'Hare Airport intending ultimately to travel to Pakistan in order to meet with Pasha and KASHMIRI and to deliver to them the approximately 13 surveillance videos.

    f.  With respect to Count Twelve of the Superseding Indictment:

   Beginning no later than in or about late 2005, and continuing to on or about October 3, 2009, defendant knowingly provided material support or resources to a foreign terrorist organization, namely *Lashkar e Tayyiba*. More specifically, defendant knew at least as early as 2004, that *Lashkar e Tayyiba* was designated by the Secretary of State as a foreign terrorist organization.  At the same time, defendant knowingly worked under that terrorist organization's direction and control, as described herein in subparagraph (a).

    g.  The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

  7.  Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

    a.  Count One carries a maximum sentence of life imprisonment or the death penalty because death resulted. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation on this count. Count One also carries

a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count One the judge also may impose a term of supervised release of not more than five years.

b.    Count Two carries a maximum sentence of life imprisonment. Pursuant to Title 18, United States Code, Section 3561 defendant may not be sentenced to a term of probation on this count. Count Two also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count Two, the judge also may impose a term of supervised release of not more than five years.

c.    Counts Three through Eight carry a maximum sentence of life imprisonment or the death penalty. Pursuant to Title 18, United States Code, Section 3561 defendant may not be sentenced to a term of probation on these counts. Counts Three through Eight also each carry a maximum fine of $250,000. Defendant further understands that with respect to Counts Three through Eight the judge also may impose terms of supervised release of not more than five years.

d.    Count Nine carries a maximum sentence of life imprisonment. Pursuant to Title 18, United States Code, Section 3561 defendant may not be sentenced to a term of probation on this count. Count Nine also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further

17

understands that with respect to Count Nine, the judge also may impose a term of supervised release of not more than five years.

      e.    Count Ten carries a maximum sentence of life imprisonment. Pursuant to Title 18, United States Code, Section 3561 defendant may not be sentenced to a term of probation on this count. Count Ten also carries a maximum fine of $250,000. Defendant further understands that with respect to Count Ten, the judge also may impose a term of supervised release of not more than five years.

      f.    Count Eleven carries a maximum sentence of 15 years' imprisonment. Pursuant to Title 18, United States Code, Section 3561 defendant may not be sentenced to a term of probation on this count. Count Eleven also carries a maximum fine of $250,000. Defendant further understands that with respect to Count Eleven, the judge also may impose a term of supervised release of not more than five years.

      g.    Count Twelve carries a maximum sentence of life imprisonment. Pursuant to Title 18, United States Code, Section 3561 defendant may not be sentenced to a term of probation on this count. Count Twelve also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count Twelve, the judge also may impose a term of supervised release of not more than five years

h.      In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty imposed.

i.      Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is life imprisonment or the death penalty. In addition, defendant is subject to a total maximum fine of $3,000,000, or twice the gross gain or gross loss resulting from the offenses of conviction, whichever is greater, a period of supervised release, and special assessments totaling $1200.

## The Death Penalty

8.      Defendant has been cooperating with the Government since the time of his arrest on October 3, 2009, and to date has provided substantial assistance to the criminal investigation, and also has provided information of significant intelligence value. In addition, as provided for in Paragraph 12 of this Plea Agreement, the defendant has agreed to fully and truthfully cooperate in further proceedings. In light of defendant's past cooperation and expected future cooperation, and all the other relevant factors being considered, the Attorney General of the United States has authorized the United States Attorney for the Northern District of Illinois to not seek the death penalty against defendant. Defendant understands that if he should breach this cooperation agreement and if the government, at its sole discretion, voids such agreement, the government will no longer be bound by its decision not to seek the death penalty.

19

## Extradition

9.      Pursuant to Article 6 of the Extradition Treaty Between the United States and the Republic of India, Article 7 of the Extradition Treaty between the United States and the Kingdom of Denmark, and Article 4 of the Extradition Treaty between the United States and Islamic Republic of Pakistan, defendant shall not be extradited to the Republic of India, the Kingdom of Denmark, or the Islamic Republic of Pakistan, respectively, for any offenses for which he has been convicted in accordance with this plea. The defendant and the United States Attorney's Office accordingly agree that, if defendant pleads guilty to and is convicted of all offenses set out in the Superseding Indictment, including Conspiracy to Bomb Places of Public Use in India (in violation of 18 U.S.C. §2332f (a)(2)), Conspiracy to Murder and Maim in India (in violation of 18 U.S.C. §956(a)(1)), Aiding and Abetting Murder (in violation of 18 U.S.C. §2332(a)(1) and 2), Conspiracy to Murder and Maim in Denmark (in violation of 18 U.S.C. §956(a)(1)), Conspiracy to Provide Material Support to Terrorism, in both India and Pakistan (in violation of 18 U.S.C. §2339A), and Conspiracy to Provide Material Support to Lashkar-e-Tayyiba, a foreign terrorist organization (in violation of 18 U.S.C. §2339B), then the defendant shall not be extradited to the Republic of India, the Kingdom of Denmark or the Islamic Republic of Pakistan for the foregoing offenses, including conduct within the scope of those offenses for which he has been convicted in accordance with this plea, so long as he fully discloses all material facts concerning his role with respect to these offenses and abides by all other aspects of this agreement.

20

## Sentencing Guidelines Calculations

10.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.      **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2009 Guidelines Manual.

b.      **Offense Level Calculations.**

i.      The base offense level for the charge in Count One of the Superseding Indictment is 43, pursuant to Guideline §2K1.4(c) and §2A1.1. Because the defendant intentionally selected victims and property of the attacks based on the actual and perceived religion, national origin and ethnicity of persons (e.g. targets were selected because they were in India), a 3-point enhancement applies pursuant to §3A1.1. Because some victims were restrained during the offense, a 2 point enhancement is warranted pursuant to §3A1.3. Because the offense is a felony that involved a federal crime of terrorism, a 12 point enhancement applies to defendant's base offense level pursuant to §3A1.4. Defendant's use

21

of his specialized training in surveillance warrants a "special skill" enhancement of 2-point pursuant to §3B1.3. Thus, defendant's adjusted offense level is level 62;

      ii.    The adjusted offense level for Count Two is level 62 for the reasons set forth in subparagraph 11(b)(i) above (see §2A1.5);

      iii.    The adjusted offense level for Counts Three, Six and Seven is level 60 for the reasons set forth in subparagraph 11(b)(i), except that no enhancement is appropriate pursuant to §3A1.3 as the victims in those counts were not physically restrained;

      iv.    The adjusted offense levels for Counts Four, Five and Eight is level 62 for the reasons set forth in subparagraph 11(b)(i) (the victims in these counts were physically restrained);

      v.    The adjusted offense level for Count Nine is level 62 for the reasons set forth in subparagraph 11(b)(i) (see §2X2.1).;

      vi.    The base offense level for the charge in Count Ten of the Superseding Indictment is 33, pursuant to Guideline §2A1.5. Because the offense is a felony that involved a federal crime of terrorism, a 12 point enhancement applies pursuant to §3A1.4. Defendant's use of his specialized training in surveillance warrants a "special skill" enhancement pursuant to §3B1.3. Thus, the defendant's adjusted offense level for Count Ten is level 47;

      vii.    The adjusted offense level for Count Eleven is level 47 for the reasons set forth in subparagraph 11(b)(vi) (see §2X2.1);

viii.   The adjusted offense level for Count Twelve is level 62 for the reasons set forth in subparagraph 11(b)(i) (see §2X2.1);

ix.   Counts One through Nine and Twelve are grouped pursuant to §3D1.2(a) and the applicable offense level is 62;

x.   Counts Ten and Eleven are grouped pursuant to §3D1.2(a) and the applicable offense level is 47;

xi.   Therefore, the combined offense level for both groups is level 62 pursuant to §3D1.4;

xii.   Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline §3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

xiii.   In accord with Guideline §3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline §3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level

23

reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.    **Criminal History Category.**  With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal 6.  Due to the operation of Guideline §3A1.4, however, defendant's criminal history category is VI.

      i.    In or about 1988, defendant was convicted in the United States District Court for the Eastern District of New York of conspiracy to import heroin into the United States and sentenced on January 5, 1989, to four years' imprisonment.  On or about March 27, 1995, defendant was found to have violated the terms of his supervised release, and was sentenced to six months' imprisonment.  Pursuant to Guideline §4A1.2(e)(1) and (k), because defendant was incarcerated for his supervised release violation in 1995, his 1989 conviction is considered to have occurred within 15 years prior to the commencement of the instant offense, which began no later than late 2005.   Pursuant to Guideline §4A1.1, the defendant is assessed 3 criminal history points for this conviction;

      ii.    On or about July 18, 1997, defendant was convicted of conspiracy to import and possess heroin with the intent to distribute it in violation of Title 21, United States Code, Sections 963 and 846 in the United States District Court for the Eastern District of New York and sentenced on November 7, 1997, to eighteen months'

imprisonment. Pursuant to Guideline §4A1.1(a), defendant is assessed 3 criminal history points for this conviction;

        iii.    Based upon the above, defendant's total criminal history points are 6.

        d.    **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated adjusted offense level is 59, which, when combined with the anticipated criminal history category of VI, results in an anticipated advisory Sentencing Guidelines range of life imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

        e.    Defendant and his attorneys and the government acknowledge that the above Guideline calculations are preliminary in nature and based on facts known to the parties as of the time of this Plea Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation.    Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

        f.    Both parties expressly acknowledge that while none of the Guideline calculations set forth above are binding on the Court or the Probation Office, the parties have

25

agreed pursuant to Fed.R.Crim.P. 11(c)(1)(B) that certain components of those calculations – specifically, those set forth above in subparagraphs a, b and c of this paragraph – are binding on the parties, and it shall be a breach of this Plea Agreement for either party to present or advocate a position inconsistent with the agreed calculations set forth in the identified subparagraphs.

g.      Defendant understands that with the exception of the Guideline provisions identified above as binding on the parties, the Guideline calculations set forth above are non-binding predictions, upon which neither party is entitled to rely, and are not governed by Fed.R.Crim.P. 11(c)(1)(B). Errors in applying or interpreting any of the Sentencing Guidelines (other than those identified above as binding) may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

## Cooperation

12.      Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful

26

testimony in any criminal, civil or administrative proceeding in the United States, including any proceeding before a military tribunal or commission. Defendant agrees that, when directed by the United States Attorney's Office, he will fully and truthfully participate in any debriefings for the purpose of gathering intelligence or national security information. Defendant further agrees that, when directed by the United States Attorney's Office, he will fully and truthfully testify in any foreign judicial proceedings held in the United States by way of deposition, videoconferencing or letters rogatory. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

## Agreements Relating to Sentencing

13.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Guideline §5K1.1, to depart downward from the applicable Guideline range. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court. Defendant further understands that the government reserves the right to make whatever recommendation it deems appropriate regarding the extent of any downward departure.

14.     If the government does not move the Court, pursuant to Sentencing Guideline §5K1.1, to depart from the applicable Guideline range, as set forth above, the preceding paragraph of this plea agreement will be inoperative, both parties shall be free to recommend

any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to §5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline §5K1.1.

15.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Plea Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

16.     Defendant agrees to pay the special assessment of $1200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

18.     This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 09 CR 830.

19.     This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

20.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.      **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.      The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be

29

conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.      If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the Superseding Indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.       At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would

30

be able to confront those government witnesses and his attorney would be able to cross-examine them.

    vi.  At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

    vii.  At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

    b.  **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. Defendant also waives his right to challenge his

31

conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

    c.  Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorneys have explained those rights to him, and the consequences of his waiver of those rights.

   21.  By entering this plea of guilty, defendant also waives any and all right the defendant may have, pursuant to 18 U.S.C. §3600, to require DNA testing of any physical evidence in the possession of the Government. Defendant fully understands that, as a result of this waiver, any physical evidence in this case will not be preserved by the Government and will therefore not be available for DNA testing in the future.

32

### Presentence Investigation Report/Post-Sentence Supervision

22.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

23.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline §3E1.1 and enhancement of his sentence for obstruction of justice under Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

24.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions,

33

correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

25.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

26.     Should defendant engage in additional criminal activity after he has pled guilty but prior to sentencing, defendant shall be considered to have breached this plea agreement, and the government at its option may void this Plea Agreement.

## Conclusion

27.     Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

28.     Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any

of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

29.   Should the judge refuse to accept defendant's plea of guilty, this Plea Agreement shall become null and void and neither party will be bound thereto.

30.   Defendant and his attorneys acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

35

31.    Defendant acknowledges that he has read this Plea Agreement and carefully

reviewed each provision with his attorneys.    Defendant further acknowledges that he

understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: _MARCH 18, 2010_


_Patrick J. Fitzgerald_
PATRICK J. FITZGERALD
United States Attorney

_Headley_
DAVID COLEMAN HEADLEY
Defendant

_John T. Theis_
JOHN T. THEIS
Attorney for Defendant

_Robert D. Seeder_
ROBERT D. SEEDER
Attorney for Defendant