UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    09 CR 830 |
| v. | ) | |
| | ) | Judge Harry D. Leinenweber |
| DAVID COLEMAN HEADLEY | ) | |

**GOVERNMENT'S POSITION PAPER
AS TO SENTENCING FACTORS**

The United States of America, by and through its attorney, Gary S. Shapiro,

Acting United States Attorney for the Northern District of Illinois, respectfully submits

the following as its position paper as to sentencing factors and objections to the

Presentence Report:

## I.    Introduction

Determining the appropriate sentence for David Headley requires consideration

of uniquely aggravating and uniquely mitigating factors.  Headley played an essential

role in the planning of a horrific terrorist attack.  His advance surveillance in India

contributed to the deaths of approximately 164 men, women, and children, and injuries

to hundreds more.  Undeterred by the shocking images of death and destruction that

came out of Mumbai in November 2008, Headley traveled to Denmark less than two

months later to advance a plan to commit another terrorist attack.  Headley not only

worked at the direction of Lashkar e Tayyiba for years, but also with members of

al Qaeda.  There is little question that life imprisonment would be an appropriate

punishment for Headley's incredibly serious crimes but for the significant value

provided by his immediate and extensive cooperation.

As discussed in this and other filings, the information that Headley provided following his arrest and in subsequent proffer sessions was of substantial value to the Government and its allies in its efforts to combat international terrorism. In addition to providing insight into the personnel, structure, methods, abilities and plans of Lashkar, Headley took active steps to further the investigation into other terrorists. Headley's cooperation assisted the Government in filing criminal charges against at least seven other individuals, and his testimony helped to secure the conviction of one co-defendant. Headley cooperated with foreign law enforcement, answering questions without restriction from Indian law enforcement over the course of seven full days, and the government expects his cooperation to extend well into the future.

Pursuant to Guideline § 5K1.1, the government will move the Court to sentence Headley at a point below the life imprisonment that the Guidelines recommend. The government submits that imposing a sentence of 30 to 35 years' imprisonment strikes a fair and just balance between the despicable nature of his crimes and the significant value of his cooperation.

## II.   Background

### A.   Headley's Criminal Conduct

Headley pleaded guilty to twelve separate charges stemming from three separate episodes of criminal conduct. First, he pleaded guilty to charges arising from the November 2008 terrorist attacks in Mumbai: conspiracy to bomb places of public use and commit murder in India (Counts One and Two), aiding and abetting the murder of United States nationals (Counts Three through Eight), and conspiracy to

2

provide material support to the Mumbai attacks (Count Nine). Second, he pleaded guilty to charges arising from the plot to attack the *Jyllands-Posten* newspaper facility in Copenhagen, Denmark: conspiracy to commit murder in Denmark (Count Ten) and conspiracy to provide material support to the Denmark plot (Count Eleven). Third, he pleaded guilty to providing material support to a foreign terrorist organization (Count Twelve), having trained with and worked at the direction of Lashkar e Tayyiba for years.

As the Court has heard much about the defendant's offense conduct during his testimony at trial as well as during his change of plea, the government will not reiterate the extensive details of Headley's criminal conduct.[1] In sum, after serving two separate sentences for federal narcotics trafficking offenses, Headley returned to live in Pakistan. Subsequently, starting in 2002 and continuing to 2005, Headley attended five separate Lashkar training camps where he was indoctrinated on the merits of waging jihad and trained in combat skills. When Lashkar leaders decided that Headley would better serve them by conducting advance surveillance, he changed his name and enlisted the assistance of his friend, Rana, to travel to and stay in Mumbai without detection starting in 2006 and continuing to 2008.

Headley provided video of and intelligence about the locations that later were targeted during the Mumbai attacks. Headley also assisted in plotting out a portion

---

[1] A more thorough review of the nature and circumstances of defendant's criminal is detailed in the Government's Version provided to Probation and attached to the PSR.

of the nautical route that the attackers would take, and recommended the landing point that they later used to enter Mumbai without being detected. Headley played a supporting role to the attacks, but an essential one that unquestionably contributed to the mass murder that took place.

Before the Mumbai attacks took place, Headley was instructed by his Lashkar handler to travel to Denmark to perform surveillance for yet another attack. After seeing what took place in Mumbai in November 2008, Headley traveled to Denmark in January 2009. There, he gained entry to two separate facilities for the newspaper, using the same cover story provided to him by Rana that he used in Mumbai. In February and May 2009, he met with Ilyas Kashmiri, who encouraged Headley to break away from Lashkar and plan the attacks in Denmark with his group. Kashmiri directed Headley to meet with associates in the United Kingdom, and inform them that the plan was to take over the newspaper building and fight to the death with responding Danish forces. Specifically, Kashmiri told Headley that he wanted the attackers to behead hostages and throw the heads on the street in order to heighten the response from Danish authorities.

Headley traveled to the United Kingdom to meet with those associates in July 2009, and thereafter visited Copenhagen a second time, where he took more video of the intended target. In early October 2009, Headley was arrested at O'Hare Airport, where he was set to travel to Pakistan to again meet with Kashmiri, as well as Sajid.

In sum, Headley worked to advance the violent goals of terrorist organizations and terrorist attacks for approximately seven years.

### B.    The Victims

The death toll from the Mumbai attacks was staggering. More than 164 men, women and children from around the world were killed by Lashkar terrorists during the three-day siege on Mumbai.[2]  Hundreds more were seriously injured.  The far-reaching and devastating impact of those attacks may never subside.

 Among those killed were six Americans:  Sandeep Jeswani, Aryeh Teitelbaum, Ben Zion Chroman, Gavriel Holtzberg, Alan Scherr, and Naomi Scherr.  Sandeep ("Sam") Jeswani was a Chicagoan, who worked for a company that provided radiation therapy for cancer patients and was traveling to Mumbai on business when he was killed at the Oberoi hotel.  Mr. Jeswani is survived by his wife and his parents.  Mr. Jeswani was the sole source of support – both financial and emotional – for his parents, who are devastated by his loss, as set forth in their letter to the Court.

Attackers at the Oberoi Hotel also gunned down Alan Scherr and his 13-year-old daughter, Naomi.  Mr. Scherr was a university professor and worked with the Synchronicity Foundation, a spiritual organization.  Mr. Scherr and Naomi lived in Virginia, where Naomi was a high-achieving student who was home-schooled.  Mr. Scherr and Naomi are survived by Kia Scherr, Mr. Scherr's widow and Naomi's mother.  The Scherrs traveled to India on a spiritual pilgrimage in November 2008 with approximately 20 other people.  They were killed while eating in the first-floor

---

[2]    Attached hereto is a list of the victims who lost their lives during the Mumbai attacks.  The information concerning particular victims was obtained from open source reporting.

café of the Oberoi Hotel and four other members of their group were injured. Andreina Varagona, who was dining with the Scherrs, described what took place:

> [T]wo gunmen came running into the packed restaurant, bullets flying. I remember hearing screams and saw all of us sitting there, frozen with fear. "Everyone get under the table now," I shouted on instinct. I had no idea who the gunmen were or why we under attack. All six of us dived down but Naomi was so scared – she just kept screaming and screaming. Her dad, Alan, was desperately trying to calm her. Shots were ringing out as the gunmen peppered the restaurant with fire. "We have to play dead," I said. But as I reached up to grab Alan's neck, I suddenly felt the warm spray of blood on my face and in my hair . . . Naomi's screams had stopped too and I saw her lying lifeless besides him. They'd both been shot dead.

Three United States nationals were killed in gruesome fashion by the attackers in the Chabad Nariman House in Mumbai. When the attackers killed Rabbi Aryeh Teitelbaum, they stole a father from eight children and a husband from Teitelbaum's wife. Rabbi Teitelbaum was born in New York and made a home in Israel, where he was well-known intellectual and assisted his father as a supervisor for a kosher certifying agency. He traveled to Mumbai in November 2008 for the agency. After performing kosher inspections, he attended services at the Mumbai Chabad House, where he was killed.

Rabbi Ben Zion Chroman was in Mumbai to help Rabbi Teitelbaum supervise a food packing plant that was under kosher certification. In addition to being a kosher supervisor, Chroman was a school administrator in Israel. He traveled frequently for his kosher supervising duties, and went to the Chabad House in Mumbai to enjoy afternoon services and a kosher meal before leaving India. Only 28 years-old when he was killed, Chroman is survived by his wife and his three young children.

6

The couple who ran the Chabad Nariman House, Rabbi Gavriel Holtzberg and his pregnant wife, Rivka, were also killed after being taken hostage by the attackers. Their young son, Moshe, was not even two-years old during the horrifying attack. In an act of courage, Moshe's nanny rescued him from the attack. Rabbi Holtzberg was a citizen of the United States and Israel; Rivka was a citizen of Israel. Prior to living in Mumbai, the couple lived in Brooklyn, where Rabbi Holtzberg grew up. They moved to Mumbai to manage the Chabad House, where they led religious classes and created a comforting home away from home for Jews in Mumbai.

There were many other victims of the attack who have to live with the horror of what they experienced in Mumbai. Several victims have written to the Court about their experiences and how the attacks continue to affect them today.

Further, the innocent employees who work for the *Jyllands-Posten* in Copenhagen and the Danish forces that would have responded to the stronghold attack being planned are victims as well. In particular, the editor and cartoonist have written extensively about the fear that exists in their everyday lives, a fear that certainly was heightened when the Denmark murder plot was discovered. The threat of violence also has affected the Danish government in that it is estimated that the Danish government has spent millions of dollars providing protection for the cartoonist.

### C.    Headley's Cooperation

Immediately after his arrest, Headley agreed to cooperate. On the first day of interviews, Headley volunteered information about his role in conducting surveillance in Mumbai. After being specifically advised that, based on the information that he was

7

providing, he likely would face charges that carried the death penalty in the United States, Headley continued to speak with investigators for two weeks before his arrest became public. Further, Headley has been interviewed in dozens of proffer sessions. Headley has provided extensive detail about Lashkar e Tayyiba, including its:

- Organizational structure
- Leadership and other personnel
- Recruiting methods
- Fundraising methods
- Training methods
- Planning of attacks
- Potential Targets

Headley similarly provided extensive detail about Ilyas Kashmiri and his network.

In addition to providing information, Headley took active steps to assist law enforcement. Before his arrest became public, Headley communicated with several associates at the direction of law enforcement. Through these communications, law enforcement was able to identify additional members of Kashmiri's network and gain other valuable information.

Headley substantially assisted the criminal investigation in this case. The information that Headley provided led to criminal charges against at least seven other individuals, including:

- Sajid Mir, a senior Lashkar leader who was one of the main architects of the Mumbai attacks and acted as one of the controllers providing directions to the ten attackers. Sajid was Headley's handler.

- Abu Qahafa, a senior Lashkar member who provided combat and other training to the ten attackers and acted as one of the controllers.

8

- Mazhar Iqbal, a senior Lashkar leader who acted as one of the controllers.

- Major Iqbal, who Headley reported to be an ISI officer who helped plan and fund the Mumbai attacks.

- Ilyas Kashmiri, the leader of *Harakat ul Jihad al Islami* (HUJI), a terrorist organization that trained terrorists and executed attacks against India. Kashmiri also worked with *al Qaeda*, meeting regularly with Mustafa Abu al Yazid, a/k/a "Sheik Said al Masri."

- Abdur Rehman Hashim Syed, a retired Pakistani military officer who once belonged to Lashkar, but had starting working with Kashmiri.

- Tahawwur Hussain Rana, who provided material support to Lashkar and to a conspiracy to commit murder in Denmark.

As the Court knows, Headley's testimony helped secure a conviction against Rana. Further, Headley has agreed to provide truthful testimony in any proceeding in the United States if called upon by the United States Attorney's Office, as well as any foreign judicial proceeding held in the United States by way of deposition, videoconferencing or letters rogatory.

In addition to meeting with investigators from the United States, Headley was interviewed by Indian law enforcement officers for seven days. Headley answered their questions without any restriction, and the government understands that the Indian government found the information to be useful. Additionally, Headley has taken other steps and provided other information to assist authorities.[3]

---

[3] The government has filed under seal and with the agreement of defense counsel an *ex parte* Classified Supplement to its Position Paper.

**D.      Headley's Plea Agreement**

Headley pleaded guilty to all twelve charges in the Superseding Indictment.  In light of his past cooperation and his anticipated future cooperation, as well as other relevant factors, the government agreed to not seek the death penalty against him and to not extradite him to Pakistan, India or Denmark for the offenses to which he pleaded guilty.  Further, the government agreed to move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable Guideline range.

**E.      The Presentence Report**

With one exception, the government agrees with the calculations of the Probation Department.  Probation determined that defendant's overall offense level was 59.  Further, although defendant had six criminal history points based on two prior convictions for narcotics trafficking, he is in criminal history category VI based on the application of Guideline § 3A1.4.  The guideline range, therefore, is life imprisonment.

**1.      Guideline § 3A1.4 – Counts One through Nine and Twelve**

The Probation Office correctly concluded that Guideline § 3A1.4 (the "terrorism enhancement") is applicable to Counts One through Nine and Count Twelve.  PSR, ¶¶ 89, 98, 106, 115, 124, 132, 140, 149, 157, 164, and 178.  In short, the Guidelines require a twelve level increase in the offense level and an adjustment to criminal history category VI where the defendant's offense "is a felony that involved, or was intended to promote, a federal crime of terrorism."  Guideline § 3A1.4.  The term "federal crime of terrorism" is defined as an offense that is a violation of one of a

10

number of specified statutes and that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *See* 18 U.S.C. § 2332b(g)(5); *see also United States v. Ashqar*, 582 F.3d 819, 824 (7th Cir. 2009).

Section 2332b(g)(5) expressly identifies all of the statutes that defendant was convicted of violating (18 U.S.C. §§ 956(a)(1), 2332(a)(1) and 2, 2332f(a)(2), 2339A and 2339B) as offenses supporting the terrorism enhancement. Thus, the only question for the Court is whether the preponderance of evidence demonstrates that the offenses charged in Counts One through Nine and Twelve were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Ashqar*, 582 F.3d at 824. Although the Seventh Circuit has yet to consider whether a sentencing court must make factual findings in support of the application of the terrorism enhancement, the government respectfully requests that the Court do so, consistent with the Fourth Circuit's holding in *United States v. Chandia*, 675 F.3d 329, 334 (4th Cir. 2012) (if the sentencing court concludes that the terrorism enhancement is applicable, it was to "identify the evidence in the records that supports its determination").

Counts One through Nine charged defendant with a number of offenses, including murder, related to the three-day terrorist attack on Mumbai, India, in November 2008. Count Twelve charged defendant with providing material support to Lashkar, the Pakistan-based terrorist organization that masterminded and carried out the Mumbai attacks, among other crimes. Based upon Lashkar's overall goals with

respect to the government of India, the manner in which the attacks were carried out, the targets chosen for attack, and Headley's feelings about the attacks, there can be no doubt that Lashkar's attack on Mumbai was calculated to influence, affect, and retaliate against the Indian government.

Headley testified that Lashkar carries out jihad. Tr. 71. He understood that Lashkar's goal was to influence, affect and retaliate against the government of India. Specifically, Headley testified that Lashkar's goal was to fight with Indian forces until "India complied with the UN resolutions that called for the right of self-determination for Kashmiris. And secondary was to avenge deaths of civilians that Indian troops were guilty of." Tr. 70-71.[4] Headley explained that, in order to carry out its jihadist goals in India, Lashkar sent fighters across the border into India to engage in violent attacks. Tr. 71. Headley further testified in detail about the Lashkar weapons and military training courses he attended, which included training in weapons such as AK-47 guns, pistols, grenades and explosives. Tr. 73-78.

As set forth in the government's Objections to the Presentence Report related to co-defendant Rana, Lashkar's jihadist mission and ideology also extends beyond Kashmir. *See* R. 352 at 24-25. Lashkar has declared that it wages jihad in order to restore Islamic rule over India and bring about the union of all Muslim regions surrounding Pakistan. *Id.* Lashkar views the United States, Israel, and India as

---

[4]    In placing a $10 million reward on information leading to the arrest of Hafiz Saeed, the leader of Lashkar, the United States government described Lashkar as a militant organization dedicated to installing Islamist rule over parts of India and Pakistan. *See* Government's Version of Offense Conduct for Tahawwur Rana, GV Exhibit Articles.

12

enemies of Islam.  *Id.*  As Headley was aware, the United States designated Lashkar as a Foreign Terrorist Organization in December 2001.

Beginning in 2006 and continuing through 2008, Lashkar sent Headley to India to complete surveillance of various targets, many of which were ultimately attacked in November 2008.  One of the key targets that Lashkar instructed Headley to surveil on multiple occasions was the Taj Mahal Hotel.  R. 147-48.  The Taj Hotel, built to resemble the Taj Mahal,  was a symbol of India and a hotel where "important" and "wealthy" people stayed.  Tr. 148-49.  Just in front of the Taj Hotel was the Gateway of India, a historic landmark in Mumbai, where Headley also performed surveillance. Tr. 150-51.  One of the reasons that Lashkar targeted the Taj Hotel for attack was the fact that the hotel contained a conference center where conferences of Indian defense contractors and scientists held meetings.  Tr. 166-67, 186.  Headley was even instructed to obtain a schedule of conferences at the Taj Hotel.  Tr. 191-193.

In addition to the Taj Hotel, Headley also performed surveillance of the Oberoi Hotel, Chabad House, Leopold Café, and Chhatrapati Shivaji Terminus ("CST").  CST is the main rail station in Mumbai, through which thousands of Indian commuters travel. Tr. 224-226.  The Oberoi Hotel, like the Taj, is a high-end hotel in Mumbai, Tr. 178, 290-91.  Headley understood the Chabad House to be a residence for Jewish and Israeli people who visit Mumbai. Tr. 287. Headley testified that Major Iqbal explained to him that the Chabad House was on the list of targets for the Mumbai attacks because Major Iqbal believed that it was a front for the Mossad, which is the Israeli national intelligence agency.  Tr. 281.  Each of these locations – the Taj Hotel, Oberoi

Hotel, Leopold Café, Chabad House, and CST – were attacked during the November 2008 attacks. Furthermore, Headley surveilled additional potential targets for Lashkar while in India, many of which were government buildings. For example, Headley surveilled the Indian Naval Air Station, Maharashstra state police headquarters, Shiv Sena headquarters (an Indian political party), and a temple run by Shiv Sena. Tr. 169, 183, 279-280.

The three-day siege of Mumbai by Lashkar fighters, who were being directed by Lashkar leaders from a control room in Pakistan, resulted in the death of at least 164 people and many hundreds more were injured. Coordinated attacks occurred at locations throughout Mumbai. *See* Stipulation 1. In addition to the Taj Mahal Hotel, Oberoi Hotel, Leopold Café, Chabad House, and CST, the Lashkar fighters were instructed to place explosives in the taxi cabs they had taken to attack locations. Tr. 324. These explosives, which were on timers, detonated in different areas of the city once the attacks began, causing even more destruction and confusion in the city of Mumbai. *Id.*

That the purpose of such a widespread, sophisticated attack was not only to kill civilians, but to fulfill Lashkar's goal of influencing, affecting, and retaliating against the government of India, was made clear by targets of attack and the manner in which it was carried out. Lashkar had committed an attack on a grand and horrific scale. The specific targets chosen by Lashkar, including symbolic targets such the Taj Hotel and CST, reflected the goal and purpose of the attack. Indeed, we know from Headley's testimony that one of the reasons Lashkar targeted the Taj Hotel was to kill Indian

14

defense contractors – individuals perceived to assist in the Indian military's efforts in Kashmir. That multiple locations throughout the city were targeted for attack also reflected Lashkar's goal to influence the government. Furthermore, the attack of the Chabad House was arguably intended to influence and affect the government of Israel, as well as India, since it was targeted because of the perception that it was a front for the Israeli intelligence agency. The controllers, in fact, communicated directly with Israeli government officials about the hostages taken at the Chabad House, trying to secure the release of one of the Lashkar attackers.

Notably, Headley's mindset in assisting Lashkar with the planning of the attacks was clearly to influence and to retaliate against Indian government conduct. Headley testified that he was pleased by the attacks. Tr. 315. Headley told his friend Rana that, as a result of the Mumbai attacks, "we were even with the Indians now. And even if Pakistan wasn't even, I was even for my school." Tr. 350. Headley explained that, as a child, his school in Pakistan was bombed by the Indians, so he felt that the Mumbai attacks exacted revenge for that bombing. *Id.* Rana responded, "they [the Indians] deserved it." Tr. 351.

For all of these reasons, as well as all of the facts in the record, the government submits that Headley's involvement in the deadly Mumbai attacks and in supporting Lashkar was calculated to influence, affect, and retaliate against the Indian government. Thus, the Court should apply the terrorism enhancement to Counts One through Nine and Count Twelve. Among the many other facts in the record, the government would highlight the following facts, which are more than sufficient to

15

establish the applicability of the terrorism enhancement:

- Headley understood that Lashkar's goal was to fight with Indian forces in order to influence the Indian government with respect to the Kashmir area and to retaliate against the government of India for having Indian troops kill Pakistani civilians.

- To carry out jihad in India and influence the Indian government, Lashkar sent trained fighters across the border into India to engage in violent attacks. Indeed, Headley attended Lashkar military training courses.

- One motivating factor for Headley to work with Lashkar in planning the attacks in Mumbai was Headley's desire to retaliate against the Indian government for attacking his school in Pakistan.

- Lashkar attacked many targets throughout Mumbai during the three-day siege in November 2008, including symbolic targets such as the Taj Mahal Hotel and CST. Lashkar designed the attacks to maximize the number of deaths and confusion throughout the city.

- Lashkar targeted Indian defense contractors and scientists during the Mumbai attacks.

- Lashkar targeted the Chabad House during the Mumbai attacks in part because it was believed to be a front for the Israeli intelligence agency.

- The terrorism enhancement is applicable to Count Twelve for the additional reason that Headley surveilled Indian government locations for Lashkar that were not attacked in November 2008, including the Indian Naval Air Station, Maharashstra state police headquarters, and the Shiv Sena complex.

### 2. Guideline § 3A1.4 – Counts Ten and Eleven

Based upon the Court's ruling that the terrorism enhancement was not applicable to co-defendant Rana's conviction for Count Eleven, the Probation Office found that the terrorism enhancement did not apply to Count Eleven. PSR, ¶ 170. The government respectfully objects to the Probation Office's conclusion as to Count Eleven because the preponderance of the evidence proved that the Denmark plot was

16

calculated to retaliate against the Danish government for its actions (or inactions) with respect to the publication of the Prophet Mohammad cartoons and to influence or affect the Danish government through acts of violence. The government's position regarding the application of the terrorism enhancement with regard to the Denmark plot and to the provision of material support to Lashkar was set forth at length in the Government's Objections to the Presentence Report with respect to co-defendant Rana, R. 352 at 3-30, which the government incorporates herein.

Count Ten charged Headley with participating in a conspiracy to murder and maim in Denmark and Count Eleven charged Headley with conspiring to provide material support to the conspiracy charged in Count Ten.[5] As the Court is well aware, these counts related to Headley's plan with Lashkar, and then with Ilyas Kashmiri, to attack the *Jyllands-Posten* newspaper in Denmark to avenge the Prophet Mohammad cartoons. As a part of the sentencing of co-defendant Rana, the Court ruled that the terrorism enhancement did not apply to Rana's conviction under Count Eleven. Sentencing Transcript at 28. Specifically, the Court found that, at least as far as defendant Rana was concerned, the planned attack was against a private newspaper, to be carried out on private property. *Id.* Although the Court declined to apply the terrorism enhancement to Rana's conviction under Count Eleven, the government

---

[5] The Probation Office declined to apply the terrorism enhancement to Count Eleven based upon the Court's ruling with respect to defendant Rana, but applied the terrorism enhancement to Headley's conviction under Count Ten, a charge which also related to the Denmark plot. PSR, ¶¶ 164 and 170. Because the two counts relate to the same underlying terror plot, the government addresses both counts as a part of its objection.

submits that the terrorism enhancement applies to defendant Headley's convictions under both Counts Ten and Eleven based upon Headley's actions with respect to the Denmark plot.

The government's Objections to the Presentence Report for co-defendant Rana contained extensive legal and factual analysis in support of the government's position that the terrorism enhancement is applicable to the Denmark plot. R. 352 at 3-23. The government has incorporated that analysis herein and therefore will not repeat it. In addition to all of the facts set forth in the Objections to the Presentence Report for Rana (which were focused on Rana's conduct), the government submits that the following facts related to Headley's conduct support the application of the terrorism enhancement to Headley's convictions under Counts Ten and Eleven:

- Headley repeatedly met with Sajid Mir, a high-ranking member of Lashkar and mastermind of the Mumbai attacks, to plan the attack in Denmark. Headley knew that Sajid Mir, and by extension, Lashkar, believed "all Danes" were responsible for the Prophet Mohammad cartoons and therefore rejected Headley's suggestion that only the cartoonist and editor of the Jyllands-Posten be targeted.

- Knowing Lashkar's view that the attack was intended to be an attack on Denmark, and not just the *Jyllands-Posten*, Headley traveled to Denmark and performed surveillance of potential targets.

- After Lashkar decided to put its attack plans in Denmark on hold, Headley met with co-defendants Kashmiri and Pasha to assist him in planning the attack.

- Kashmiri specifically designed the attack on the *Jyllands-Posten* in such a way to heighten the response from Danish law enforcement, namely, by beheading individuals in the *Jyllands-Posten* building and throwing their heads into the streets of Denmark.

- At Kashmiri's direction, Headley met with Kashmiri's associates and informed them of the attack plans. Headley also traveled again to Denmark to perform additional surveillance, including surveillance of Danish soldiers.

- Headley was aware that Kashmiri worked with al Qaeda (Tr. 321-22) and that al Qaeda had masterminded a suicide bomber attack on the Danish Embassy in Pakistan in retaliation for the Prophet Mohammad cartoons in June 2008.

- Headley watched an al Qaeda video with Pasha regarding the bombing of the Denmark Embassy in Pakistan. Tr. 401. Headley testified that the video showed that the context for this attack were the Prophet Mohammad cartoons published by the Danish newspaper. *Id.*

- Headley discussed with co-defendant Rana that the head of the Danish government at the time of the cartoons' publication, Prime Minister Anders Fogh Rasmussen, should not have been selected as NATO chief because of his responsibility for the cartoons.

- In discussions with Rana, Headley referred to "Denmark" as the target of the plot.

For the foregoing reasons, as well as those set forth in the government's Objections to Rana's Presentence Report, the Court should apply the terrorism enhancement to defendant Headley's convictions under Count Ten and Eleven.

19

## III.  Conclusion

The government submits that a sentence of 30 to 35 years' imprisonment strikes a fair and just balance between the aggravating and mitigating factors applicable to Headley.  While there is no question that his criminal conduct was deplorable, his decision to cooperate, and the uniquely significant value that cooperation has provided to the government's efforts to combat terrorism, support the government's recommendation.

Respectfully submitted,
GARY S. SHAPIRO
Acting United States Attorney

By: /s/ Daniel J. Collins
DANIEL J. COLLINS
SARAH E. STREICKER
Assistant United States Attorney
219 South Dearborn Street,5th Floor
Chicago, Illinois 60604
(312) 886-3482