<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3
      UNITED STATES OF AMERICA,    )  Docket No. 09 CR 830
 4                                 )
                     Plaintiff,    )  Chicago, Illinois
 5                                 )  January 24, 2013
                 v.                )  10:33 o'clock a.m.
 6                                 )
      DAVID COLEMAN HEADLEY,       )
 7                                 )
                     Defendant.    )
 8
                    TRANSCRIPT OF PROCEEDINGS - SENTENCING
 9                 BEFORE THE HONORABLE HARRY D. LEINENWEBER

10    APPEARANCES:

11    For the Government:          MR. GARY SHAPIRO
                                   Acting United States Attorney by
12                                 MR. DANIEL J. COLLINS
                                   MS. SARAH E. STREICKER
13                                 219 South Dearborn Street
                                   Chicago, Illinois 60604
14
      For the Defendant:          MR. ROBERT DAVID SEEDER
15                                FEDERAL DEFENDER PROGRAM
                                  55 East Monroe Street
16                                Suite 2800
                                  Chicago, Illinois  60603
17
                                  LAW OFFICE OF JOHN T. THEIS by
18                                MR. JOHN THOMAS THEIS
                                  190 South LaSalle Street
19                                Suite 520
                                  Chicago, Illinois  60603
20

21    Court Reporter:            GAYLE A. MCGUIGAN, CSR, RMR, CRR
                                 Official Court Reporter
22                               219 South Dearborn Street
                                 Room 2318-A
23                               Chicago, Illinois 60604
                                 (312) 435-6047
24

25
</pre>

 1        (In open court:)

 2             THE CLERK:  Court resumes in session.  Please be

 3    seated.

 4             09 CR 830, United States versus David Headley.

 5             MR. COLLINS:  Good morning, your Honor.  Dan Collins

 6    and Sarah Streicker on behalf of the United States.

 7             MR. THEIS:  Good morning, your Honor.  John Theis and

 8    Robert Seeder on behalf of the defendant, David Headley.

 9             MR. SEEDER:  Good morning, Judge.

10             PROBATION OFFICER:  Good morning, your Honor.  Malissa

11    Groth for Probation.

12             THE COURT:  Is Mr. Headley --

13             MR. THEIS:  I assume he's on his way.

14             THE CLERK:  They're coming.

15        (Defendant enters courtroom.)

16             THE COURT:  Let the record show the defendant is now

17    present.

18             Did you call the case yet?

19             THE CLERK:  Yes, I did.

20             THE COURT:  Okay.  We're here for sentencing.  Is

21    everybody ready?

22             MR. COLLINS:  We are, your Honor.

23             THE COURT:  Okay.  Appearances?

24             MR. THEIS:  Ready to proceed as well.

25             THE COURT:  Appearances, have we done that yet?

1      MR. COLLINS:  Yes, your Honor, we have.

2      THE COURT:  Okay.  We're here for sentencing.  I have

3  received the presentence report prepared by Malissa Groth.  I

4  have received the defendant's sentencing memorandum.  I've

5  received the government's position paper and the government's

6  ex-parte paper and several victim impact statements, and this

7  morning I received a supplemental report from Miss Groth.

8      Anything else I should have?

9      MR. THEIS:  May I have one moment, Judge?

10     (Counsel conferring.)

11     MR. THEIS:  No, your Honor.

12     MR. COLLINS:  No, your Honor.

13     THE COURT:  All right.  Mr. Theis, have you read the

14  presentence investigative report?

15     MR. THEIS:  Yes, your Honor.  We have read it, and

16  yesterday we had the opportunity to read it and go over it with

17  Mr. Headley as well.

18     THE COURT:  Mr. Headley, have you read the presentence

19  report?

20     THE DEFENDANT:  Yes, your Honor, I have.

21     THE COURT:  Have you discussed it with your attorneys?

22     THE DEFENDANT:  I have.

23     THE COURT:  Factually, is it accurate?

24     MR. COLLINS:  Yes, your Honor.

25     MR. THEIS:  Yes.  We have no corrections.

1          THE COURT:  Is that correct, Mr. Headley?  It's

2    accurate?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  I believe the guideline calculations of

5    the presentence report are in agreement with the guideline

6    calculations in the plea agreement.  Is that correct?

7          MR. COLLINS:  It is, your Honor, with the exception of

8    one count, which is Count 11.

9          THE COURT:  That's the one regarding Mumbai?

10         MR. COLLINS:  Yes --

11         THE COURT:  I mean --

12         MR. COLLINS:  Denmark.

13         THE COURT:  -- Copenhagen?

14         MR. COLLINS:  Yes, your Honor.

15         THE COURT:  Has the government -- does the government

16   agree that the guideline calculations are accurate?

17         MR. THEIS:  The defense agrees with the government.

18         THE COURT:  All right.  The -- consistent with my

19   ruling in the sentencing of Mr. Rana, I will rule and agree

20   with the presentence report in that the specific acts

21   concerning Copenhagen did not involve terrorist acts directed

22   at a government.

23         That's over the objection of the government.  Is that

24   correct?

25         MR. COLLINS:  Yes, your Honor.

1          THE COURT:  And the defense agrees with the position

2     of the presentence report?

3          MR. SEEDER:  We do, Judge.

4          THE COURT:  All right.  So the guideline calculations

5     in the -- that does not really affect the bottom line.

6          MR. COLLINS:  It did not.

7          THE COURT:  So the total offense level is 59.

8     Criminal history category VI.  Is that correct?

9          MR. COLLINS:  Yes, your Honor.

10         THE COURT:  So that the guideline calculations is life

11    imprisonment.  Is that correct?

12         MR. COLLINS:  Yes, your Honor.

13         THE COURT:  Is that correct?  Both sides agree with

14    that?

15         MR. THEIS:  We agree, Judge.

16         THE COURT:  Now, the government, it is my

17    understanding, has -- intends to make a motion for a downward

18    departure.  Is that correct?

19         MR. COLLINS:  Your Honor, at this time we would make

20    that motion.

21         THE COURT:  All right.  Do you want to address me

22    concerning that?

23         MR. COLLINS:  As to the motion or the overall

24    sentence, your Honor?

25         THE COURT:  Why don't you do both.

1          MR. COLLINS:  Okay.  Well, your Honor, at this time

2     the government would move pursuant to 5K1.1 to depart from the

3     guideline sentence and impose a sentence of something less than

4     life imprisonment.

5          We do so based on the extensive cooperation that

6     Mr. Headley provided to this investigation that led to the

7     charges in this case, as well as the information that was

8     provided to us which was of significant intelligence value.

9          As to the sentence, your Honor, the government

10    recognized that we have to balance the seriousness of the crime

11    against the extent of Mr. Headley's cooperation.

12         And when we talk about the crime, we've heard words

13    like despicable, deplorable, horrific, shocking.  And I'm not

14    sure those words, Judge, are sufficient to describe what took

15    place here.  And I'm not sure that I'm ever going to find the

16    words to describe sufficiently how serious this crime was.

17         But I know your Honor has read and heard the words of

18    the victims and know how incredibly serious these crimes were,

19    and I know that we have to keep that in mind.

20         And the job of balancing how serious this crime was

21    against the value that Mr. Headley provided to the government,

22    its efforts to combat terrorism, is difficult.

23         Mr. Headley immediately cooperated upon his arrest.

24         The information that he provided and the investigative

25    steps he took helped us make the charges in this case.

1          But he also provided information that is going to help

2     all the people, the men and women who work hard every day to

3     combat terrorism here in the country, United States, as well as

4     overseas.  And we have to recognize the significant value of

5     that information.

6          In striking that balance, Judge, the government

7     believes that a sentence of 30 to 35 years does that.  And

8     that's our recommendation.

9          THE COURT:  Mr. Theis?

10         MR. THEIS:  Your Honor, we would, of course, agree

11    with the government's motion for a downward departure.

12         My remarks -- I'm prepared to address both the

13    departure motion and what would be an appropriate sentence in

14    this case, but I don't know -- if the Court -- if you would

15    like to rule on the motion first and -- because my remarks will

16    take several minutes.

17         THE COURT:  I will -- it's my understanding the

18    government is making a motion for a downward departure, which

19    leaves it totally in my discretion as to what sentence to

20    impose.

21         MR. COLLINS:  That's correct, Your Honor.

22         THE COURT:  All right.  So --

23         MR. THEIS:  So you would like me to --

24         MR. COLLINS:  I know there was one point, your Honor,

25    that was -- if we could ask Mr. Fitzgerald.

1          MR. THEIS:  You can do that first.

2          MR. COLLINS:  The parties have asked that we allow

3     Mr. Fitzgerald, the U.S. Attorney at the time that this case

4     was investigated and charged, to address the Court very briefly

5     from the podium.

6          THE COURT:  All right.  Mr. Fitzgerald?

7          Welcome back in the building.

8          MR. FITZGERALD:  Thank you, Judge.

9          Good morning.  And obviously I'm not appearing as a

10     government official, I'm not appearing in my private capacity

11     with a firm, but I am appearing as a fact witness, not to

12     advance any positions, but because I -- we made a commitment at

13     the time that we dealt with Mr. Headley and his counsel that we

14     would bring certain things to the attention of the Court when

15     he was sentenced.

16          And I think I'll be brief and leave the balancing of

17     what is a very, very heinous crime and very, very significant

18     cooperation to the Court and for counsel to address, but the

19     one thing I think that stands out about this case was the night

20     that Mr. Headley was arrested.  There was a lot of people in

21     the government at very high levels who were very concerned

22     about what was happening with regard to this plot in Denmark.

23     And what was striking was that within 30 minutes of Mr. Headley

24     being Mirandized, he freely admitted to his role in the

25     surveillance that led to the attacks of Mumbai, without being

1       confronted with that evidence, and then proceeded for the

2       better part of two weeks to be debriefed all day long each day,

3       being reminded of his right to not speak with the government,

4       each day being reminded of his right to counsel.  And he

5       insisted on proceeding in that vein, providing information

6       about potential terrorist attacks and others involved during

7       that time.  And during one point during that interaction, when

8       it became very clear to him, and that he was told point blank

9       that he was facing capital punishment, he insisted on

10      proceeding and provided more information.

11              And the last part of that I would put before your

12      Honor is that after he was represented by counsel, very quickly

13      early on we made clear to counsel that he made a Mirandized

14      confession, and that it was important for the government to get

15      as much information as the government could from him as quickly

16      as possible.  And with the advice of his counsel, he then went

17      forward and very quickly resumed speaking to the government.

18              So I know that you have a very difficult job before

19      you with lots of factors to consider, but the one thing we

20      always promised we would follow through on at the time, and I

21      want to follow through today, was to put before your Honor the

22      fact of the unusual nature of how quickly he did cooperate and

23      how he continued to cooperate, knowing full well that he didn't

24      have to do that.  And I wanted the Court to be aware of that.

25              Thank you.

1          THE COURT:  Thank you.

2          MR. COLLINS:  Thank you, your Honor.

3          There was another victim who wanted to address the

4    Court.  And if we could do that now.

5          THE COURT:  Fine.

6          MS. RAGSDALE:  Your Honor, I'm going to ask

7    respectively that Kia Scherr, whose husband and daughter were

8    lost in Mumbai, found out about the sentencing requirement and

9    had asked me to read a little something, so I will put a little

10   bit into what I have.  And it's on my phone, so I apologize for

11   the phone usage.  But if you will allow it for this, I would

12   appreciate the leniency.

13         I came to the Court to address you, Daood Gilani.  I'm

14   using your given name and not the name you masqueraded behind.

15         For this to have meaning, we need to have truth.  And

16   there is honor in owning in who you are and how we feel, and

17   courage in presenting that self to the world, despite what

18   others may think.

19         My name is Linda Ragsdale, though I'm here to speak

20   under the rights of the Victim Act.  It is a title I will never

21   embrace.  My first and immediate response to the word "victim"

22   was and is very direct.  I am a victor and not a victim.  In

23   fact, I'm not surviving, I'm thriving.

24         I was given another name during this event.  I awoke

25   in the hospital under the name Linda Orkastella (phonetic).

1    Orkastella translates to cast a golden light.  And Linda in

2    Spanish means beautiful.  Indeed, I was given a mission with a

3    name, one a little differently than yours.

4             I was dining in the Tiffin Restaurant in the Oberoi

5    Hotel with friends in my meditation group.  At my table that

6    evening were Naomi and Alan Scherr, father and daughter, and

7    three other friends.

8             I distinctly remember the first two flashes of light

9    that caught my eye.  The first bullet's buzz singed past my

10   ear.

11            Naomi tried to dive for her father, and we hurried to

12   get her under the table.

13            In those next moments, I saw bullets hit their first

14   targets.  Among them, my friend Michael.  The bullet took his

15   shoulder in a red rage.  So many bullets blanketed that room

16   that the weave -- waves of heat clouded my vision.

17            When the initial barrage was over, everyone at our

18   table was still alive.

19            Naomi was safe under the table with her father,

20   holding hands, their heads touching.  This is the only moment

21   in my life that haunts me.

22            I have never been exposed to people who wanted to kill

23   innocent, unarmed people, no concept of the kind of people who

24   would ever hunt survivors.

25            If I had known, I would have laid my body over

1   13-year-old Naomi.  She was the same age as my own daughter

2   back at home.  I would have not hesitated to give my life.

3      I opted to cover my friend Michael, who I assumed was

4   playing dead in the clearing by our table.  I had no idea that

5   Michael had sustained three additional bullet wounds.

6      The shooting began again, and it was confirmed.  The

7   attackers were coming table to table to execute any survivors.

8      Alan told us to play dead, but I could not.  We lay

9   there waiting for the shooter to arrive.  I remembered not

10  feeling a person, not a being coming towards me, but the void

11  of life, the absence of life walking closer.  I waited for it

12  to turn the corner.  My heart broke when I saw it.  It was just

13  a boy, a boy who held the same physique as my older son.

14     How does a young man come to think that dying is

15  better than living?

16     How does a child become so disconnected with life that

17  they choose death?

18     Who were his teachers?  Who were his teachers?

19     I wondered if he had ever been told, told and held by

20  his mother how much he was loved.  His fear was palpable in his

21  posture, timid stride, but unexplainable, because he held the

22  fire power against defenseless diners.

23     I laid my head down before he saw me.  There was only

24  one thought in my mind and heart.  If I live, I'll be fine.  If

25  I die, I'll be fine.  There's a rat-a-tat-tat, and the bullet

1   struck me.  One, two, three.  In actuality, it was one bullet.

2   The bullet entered above my heart, traveled along my spinal

3   column, passing through my stomach cavity, nicking my stomach,

4   and finally exiting out the top of my thigh.  The length of the

5   scar measures nearly three feet.  The impact knocked me out.

6   While unconscious, the young man emptied his gun into my

7   friends.  I awoke to hear Naomi take her last breath.  I lifted

8   my head, and I saw the war -- the carnage of war in a place

9   where moments before friends and families were enjoying their

10  meals.

11          I know, I know what a bullet can do to every part of

12  the human body.  I know the thick and sweetening -- sickeningly

13  sweet smell of gunfire and blood.  I know the sound of life

14  leaving a 13-year-old child.

15          These are things I never needed to know, never needed

16  to experience.

17          1/4 inch is the distance between this side of life and

18  the other for me.

19          The next voices were that of two young Indian heroes,

20  kitchen employees, who defied their fear and stayed to help any

21  survivors.

22          Three of us made it into the kitchen.  In a moment of

23  silence, I watched my blood pour out in a pool in front of me.

24  In another breath, the attackers came back with grenades.  The

25  bombs shook the walls and floor.

1          A young man tried to help us out, but my pants were

2   now too heavy for my body to move.  I told them to go ahead.  I

3   knew I was going to live.  But this young man did not leave my

4   side.  He carefully removed the pants and led us to an exit.

5   He kicked open the door, and we escaped into a beautiful,

6   silent, starlit night.

7          The next wave of heroes called out to us, taxi drivers

8   who were waiting for survivors.  That night our heroes wore the

9   clothes of the everyday person.  Each of these young heroes had

10  egress, but they chose to stay and help others.  Together, we

11  faced all of this, while you faced a TV screen.

12         I spent two weeks in the hospital in India and another

13  week at home.  It was almost four months before I could stand.

14         For the rest of my life, I will have to work to keep

15  physical mobily -- physically mobile.  To this day, the

16  practitioners manipulate the scar and tissue to achieve this.

17  Some days the pain increases to an almost unbearable stage, but

18  it does not hinder me.

19         For my family, the horror began with my husband seeing

20  the breaking news on the attack on my hotel.  His unanswered

21  phone calls made him fear the worst.  He crumbled at the pain

22  of having to inform my three children that our Thanksgiving

23  that year and forever more would not have the same meaning.

24  And even though I did return, they were warned that I might not

25  be the same person.  Their lives are marked by this event in

1  ways I will never know.  I see the pain in my family rise every

2  time a similar story comes into the headlines.

3         This is unbearable for me.

4         My friends are right there with the same experience.

5  I received calls and notes.  People remember what they went

6  through, what I went through.

7         Upon my return, I received letters from six-year-old

8  students, classrooms of children who I visited.  Instead of

9  letters creating the images I taught them how to draw, they

10 drafted "Get Well" cards.  No six-year-old child should ever

11 have to write, "I am sorry you were shot."

12        But I didn't bring home terrorism.  I brought home the

13 power of love, forgiveness, and joy.  My work is blessed by

14 this scar.  It validates the need for us to actively and

15 universally engage in teaching of peace, forgiveness, and love.

16 It inspires others to release themselves from the anchors of

17 their darkest moments.

18        Through my tears right now, you may not see this, but

19 my smile is invincible.

20        I don't know you.  I know you only from the testimony

21 in this courtroom.  In this light and understanding, I would

22 not kill you, nor would I send other people to kill you, nor

23 would I train others, nor would I come back in 30 years and

24 attack an arbitrary location in Pakistan to kill innocent

25 people as retribution for your actions.

1      I have no understanding of how you came to choose this

2  path.  A man with your intelligence could have altered the

3  lives of so many people in your own country in so many positive

4  ways.

5      I ache when I think of my friends in Pakistan who

6  could have used that money in their schools.

7      But your path is not my concern.  And justice is not a

8  concern, nor attainable here.  There could be no justice when

9  innocent lives are lost or when any lives are lost to these

10  kinds of actions.

11      So this is my wish for you:  I hope you find the kind

12  of peace and faith that comes with the faith that would have

13  you lay yourself in front of a bullet aimed at a young child or

14  a friend, rather than train other children to kill and take

15  that bullet for you; the kind of peace and faith that

16  encourages you to garner spiritual gifts while you are here on

17  earth, not in the after-life; the kind of peace and faith which

18  lets you take ownership of your actions and their consequences

19  under your own name; the peace that comes with the

20  consciousness and courage to stand for what you believe, and

21  not bargaining away the life of others for your own salvation.

22  I wish for you the peace and faith that brings to you the

23  understanding of the word "family" and our connected natures on

24  this planet; the kind of peace and faith which has you fight

25  for the education and growth of your child and every child; the

1    ability to see every child as your child, your blood; to wish

2    for your son a life of -- with peace and faith, with friends,

3    not scapegoats, and a life where he can carry his given name

4    proudly and openly.

5              To gain the understanding of peace, I would like to

6    ask the Court for several things.

7              I would like the Court to wipe out the imaginary name

8    "David Headley" and the use of the surname by any relations to

9    Daood Gilani.

10             We can only begin to change the world by owning who we

11   are.

12             I would like the Court to provide you the same voice

13   as the young murdered men of your country who now lie dead for

14   your glorious salvation.  None.  And let me be clear.  I do not

15   wish you death, but total silence and isolation, for you to

16   commune with your higher power.  I wish this space for you

17   until you regress from your corporeal body.

18             You chose to speak with your actions, and the

19   consequences of those actions now conclude your speech.

20             It's time for other people to take the stage, and

21   people are taking that stage.

22             I am just one of the many Mumbai victors.

23             I returned to India, stayed in the same hotel, and ate

24   many meals in the same spot I ate that night with my friends.

25             All I remember were the wonderful meals that I had the

1   first time and the new ones created on my return.

2           I've worked, drawn, and taught over 13,000 students

3   around the world since the moment I could first stand.

4           Imagine these efforts multiplied outward by other

5   victors, their families and friends, and the waves that

6   continue outward from there.

7           Your actions are the catalyst for loving response.

8   You have not taken away our voice or power, but empowered it.

9           Your actions places a choice.  We can let actions like

10  these go unchallenged or address them head-on.

11          In the words of my friends and fellow Mumbai victor,

12  Michael:  Surely we can teach love better than you teach hate.

13          To honor my friends at the table, I'll quote a lyric

14  from John Lennon's "Imagine," one of Alan's favorite songs:

15  Imagine all the people living for today.

16          And Lincoln Park's "No More Sorrow," one of Naomi's

17  favorite bands:  Your crusade's a disguise?  Replaced freedom

18  with fear.  You trade money for lives.  I'm aware of what

19  you've done.  No, no more sorrow.  I've paid for your mistakes.

20  Your time is borrowed.  Your time has come to be replaced.

21          And in the words of Omani, the peace dragon:  Every

22  heart has a point, every point a direction.  Which way shall

23  you go?

24          As for me, I choose the path of love.

25          Naomi called me early this morning.  She was

1    distraught over the sentencing, as we assumed that most people

2    in India will be, because this was a worldwide attack, as the

3    attacks were on 9/11 in our country, so she has asked me to

4    read this:

5            I feel that the -- for the magnitude of the killings

6    that took place, David Headley has lost his right to live as a

7    free man.  He helped make this horrific terrorist attack

8    possible.  Many poor people in Mumbai who depend on providers

9    or were injured permanently are still suffering the

10   consequences of this event.  They are receiving some help, but

11   their lives are already quite challenged.  And this has added

12   both emotional and physical duress to their everyday lives.  I

13   can forgive David Headley with compassion for one who is shut

14   off from a connection to humanity.  But his planning of this

15   attack will never be justified or excused, and he must bear the

16   consequences for the rest of his life.  It would be an

17   appalling dishonor to the 170 people that were killed in 26-11

18   terrorist attacks if David Headley only got 35 years.  This

19   would be moral outrage that is inexcusable and would not do

20   justice to the extent of this crime.

21           I think that in the balancing of the complicity with

22   our courts here and the complicity with the terrorists over

23   there that we need to honor those lives that were lost, and the

24   lives of us and my family and everyone who is the satellite of

25   this event, who are sentenced to life with all of the things

1    that we saw and all of the things that we live with.

2              Thank you, your Honor.  I appreciate it.

3              THE COURT:  Thank you.

4              MS. RAGSDALE:  May God bless you.

5              MR. THEIS:  May I proceed, your Honor?

6              THE COURT:  Yes.  Proceed.

7              MR. THEIS:  Your Honor, one thing we all agree on is

8    that this sentencing, which as I've heard many times, for

9    judges, is the hardest part of the job.  And we can all agree

10   that in this particular sentencing, where the conduct is, on

11   the -- according to the sentencing guidelines, as serious as we

12   have in our justice system, and the guidelines are literally

13   off the chart, absent the motion for a downward departure, but

14   where we also have substantial extraordinary mitigation.

15             And that mitigation consists almost exclusively of the

16   cooperation and the information that David Headley has provided

17   from the day of his arrest over the last -- over three years,

18   on a regular basis, and which cooperation has provided

19   information which has made, not only India and Pakistan and

20   this country, but many countries safer because of what he has

21   done.  It has literally saved lives, and I will address that,

22   and I'll explain that in a few moments, Judge.

23             But that said, I think we have to put everything in

24   context here.  And it is a challenge to find an appropriate

25   sentence between what we have suggested -- and I would like to

1    take a few moments to explain why our suggestion is the right

2    one -- and what the government has suggested is an appropriate

3    sentence under these circumstances.

4         I think a starting point should be the presentence

5    investigation.  You've had a chance to look at that, and you've

6    learned Mr. Headley's background.  You've seen what you already

7    knew, his role in this offense, because you heard him testify

8    here day after day during the trial of Mr. Rana.

9         The presentence investigation is detailed.  Contains a

10   lot of facts.  It does not contain the why, but I think that

11   you did have an opportunity, and I know the Court reviewed the

12   letter which Mr. Headley wrote, in his own hand, which he asked

13   to include as part of the presentence investigation, and which

14   attempts to show at least an explanation for why someone at

15   this point in his life would get involved with the people he

16   did.

17        And I think that letter, while I don't know that we

18   could ever really answer why, I think it does give some

19   explanation.

20        There was nothing in his background up until he got

21   into his 40s that would have suggested that this was the path

22   he would take.

23        He had a very secular upbringing -- or as he became an

24   adult, his work was in a bar, he worked in a video store.  He

25   had a secular life.  He was exposed, of course, to Islamic

1    teaching and religion, but that was not an important part of

2    his life.  And as you know, he even became at one point

3    involved in criminal activity and became a heroin addict, which

4    he was for a lengthy period of time.

5            And then sometime, Judge, he came into contact with

6    individuals who presented to him other ways of looking at these

7    religious tenets.

8            And why it happened and why it resonated with him and

9    how he got involved in it, of course we will never know.  Maybe

10   it was a way of dealing with whatever he was dealing with with

11   regard to his -- his drug use.

12           But in any case, it was something that he had never

13   been experienced in in the way he did.

14           And it was a type of religious beliefs that are --

15   were not what he believed in before, but it changed him, and

16   they became -- they influenced him.  And they influenced him,

17   and I'm sure that they did that for a reason, because they --

18   they learned about his background and they saw him coming and

19   they said this is somebody that we can use.

20           And he, Judge -- it doesn't explain -- it only

21   explains, it doesn't justify everything, and we'll -- I'd like

22   to address that in a few moments, but it -- when it's presented

23   to you, that you are doing something that you're doing for God

24   or you're doing for country, you look at it a different way.

25   And things that don't make sense to him now, and he's told you

1    how they -- it doesn't make sense to him now, but when everyone

2    around him is telling him that these -- the importance of these

3    things for your faith and for your country, you look at things

4    in a different way.

5            And so he did get involved, as you know, as he's told

6    you under oath, and he's told you many times, and he's told you

7    by his guilty plea, that he participated in conducting

8    surveillance for the Mumbai attacks and in, of course, in the

9    Denmark activities as well.

10           Now, saying that that's some effort at an explanation

11   in no way is meant, Judge, to indicate that he's in any way

12   walking away from the results of his activities.  He has never

13   minimized his role.  He recognized -- he's accepted

14   responsibility.  He recognized that by his guilty plea and by

15   his testimony that his actions, even though they might be under

16   legal theories of accountability or aiding and abetting, that

17   his actions were an essential part of the activities that you

18   heard about and that he pled guilty to.

19           He's never tried to suggest in any way that he was not

20   as guilty as the individuals who planned this, and as guilty as

21   the young men who were recruited to execute this plan.

22           That said, Judge, what happened in September of 2009

23   did change profoundly Mr. Headley's thinking and I think in a

24   way that this Court should take into consideration what

25   happened after that, because there's two very important things

1    that happened right away.

2         As Mr. Fitzgerald told you a few minutes ago,

3    Mr. Headley was arrested.  And when he was arrested, he was

4    arrested for his participation in what the government knew was

5    this plot to attack the journalist, the cartoonist in Denmark.

6         That moment he began cooperating from the start,

7    Judge.  He gave information which is essential not only to end

8    that plot -- because, remember, even though Mumbai had occurred

9    a year earlier, the Denmark plot was still ongoing.  There were

10   still people out there that wanted this to happen -- and -- but

11   it ended because he cooperated and gave information about that.

12   The saving of lives began at that point.

13        But this is another key thing, which also I believe is

14   critical that, at least Mr. Fitzgerald said -- I don't know,

15   maybe Mr. Collins mentioned it as well -- is that when

16   Mr. Headley started cooperating, they were asking him about

17   Denmark.  He was the first one that brought up that his -- he

18   had participated in the Mumbai attacks.

19        Now, law enforcement may have inevitably found that

20   out.  But in any case, it was very important for him to do that

21   quickly and for him to give as much information as possible

22   from the beginning.  And he did.

23        And what he did was he -- first of all, before his

24   arrest became publicly known, he participated and helped in a

25   proactive way with communication and trying to engage the

1   people who had been involved in it.  But the immediacy was very

2   important.  He gave them information that nobody else knew:

3   The names of those individuals who were in the room directing

4   those young men to do these horrible acts.  He gave them the

5   information not only about them, but their associates.  He gave

6   them information about the people that -- the organizations

7   that had been involved in it.  All of these things were of

8   critical importance.  And you know that because of what you've

9   seen in the filings before this Court, the importance of all of

10  these things.

11          He taught them about -- or told them about codes and

12  decoding and how those things happened.

13          If he had only, Judge, done that, given the

14  information about the Denmark plot, and given the information

15  about Mumbai, we would be before you asking for a downward

16  departure based on his cooperation.

17          But he did much more than that.  And that's what I

18  think -- where I think his -- his cooperation, the information

19  he's provided, the intelligence he's provided, is so profound

20  that it calls for an extraordinary departure from the

21  sentencing guidelines in this case.

22          The government has told him, and they've told you, the

23  importance of this.  It's unprecedented.  It's unique in many

24  ways.  They learned things that they could have learned from no

25  other source.

1          He was told over and over again over the last few

2    years what a difference he has made in making -- in changes

3    that were made as a result of what he has presented to their --

4    to -- in the cooperation.

5          He pushed back for years, if not forever, some of the

6    plans and plots of these people who would do harm to this

7    country and other countries around the world.

8          He provided not only information and intelligence,

9    but, Judge, he provided specific targets.  And one of the

10   things I should make clear is that, as you know, much of what

11   you have seen was done under seal -- some of it we have not

12   even seen because of its classified nature, so I'm not going to

13   talk about specific things that were done -- but this Court has

14   seen specific things that were -- that he brought to people's

15   attention which, inevitably, as any prudent country would do or

16   law enforcement or security would do, is change specific ways

17   of doing things and make things less vulnerable, because that's

18   one of the things he told -- when he was cooperating, he told

19   them the vulnerabilities that had been exposed and that they --

20   the people who would do harm already knew about.

21         So he talked about those targets.  He talked about

22   individuals and talked about practices and plans.

23         And, again, this alone -- this, in and of itself,

24   would give it sufficient grounds for the Court to make a

25   substantial departure in this case.

1          But he also did other things, Judge.

2          One of the things that he did is he sat down and he

3    talked to foreign governments.  He talked to representatives of

4    India for a week and -- on a daily basis, going to -- telling

5    them everything he knew.  He talked to other representatives of

6    other countries as well and brought things to their attention

7    that make them -- make them safer.

8          All of those things, Judge, I think the language of

9    what the government has suggested does give the Court some

10   indication as to where they believe that this will -- that this

11   cooperation lies.

12         I'd like to take a few minutes, Judge -- not even a

13   few minutes, just -- you've seen -- you are familiar with 5K1

14   and what kind of factors the Court takes into consideration.

15   They're laid out in the guidelines themselves.

16         The Court's evaluation of the significance and

17   usefulness of the defendant's assistance, taking into

18   consideration the government's evaluation of the assistance.

19         Two, the truthfulness, completeness, and reliability

20   of any information.

21         The nature and extent of the defendant's assistance.

22         Any injury suffered or danger of risk, injury to the

23   defendant or his family resulting from his assistance.

24         And the timeliness of the defendant's assistance.

25         All of those things, Judge, apply to David Headley in

1    a way that they rarely do in the typical case before your

2    Honor.

3        Just very briefly, Judge, as you know, the law allows

4    and requires or explains the relationship between that

5    cooperation and an appropriate sentence.

6        And the reason for that is everyone recognizes that

7    you have to -- have to give an incentive to people to do what

8    law enforcement needs to do, and that is to provide information

9    which makes us safer and which allows them to prosecute cases.

10        And that's what is done in this case, and that's why

11    certainly I ask the Court to consider the defendant -- the

12    government's motion for a 5K1 departure.

13        The only thing, though, Judge, where I differ with the

14    government is whether the number suggested by the government is

15    a meaningful departure.

16        The defendant is 52 years old.  The number that they

17    have suggested basically would -- would not achieve what the

18    government says is an appropriate departure, and that is to

19    have something less than life, because I think that a sentence

20    of 30 to 35 years for a 52-year-old man -- and of course we've

21    included some language with regard to life expectancy, and of

22    course life expectancy is not only -- it has to be -- it has to

23    be seen in context.  A person in prison -- and there are

24    studies that support this, and literature that supports -- a

25    person in prison, their life expectancy is not the same as if

1    they are out.

2         So it has to be a meaningful departure, Judge, or else

3    people wouldn't do what Mr. Headley did in this case.

4         The next individual who comes along who might have

5    information which could make us safer and could make -- and

6    could prosecute people who were involved in this kind of

7    activity, the next person, and who looks and says, I could

8    either go to trial, force the government to show its proof, not

9    accept responsibility, not cooperate, not put my family in

10   jeopardy, not put myself in jeopardy, or I can do all of those

11   things.  That person is going to make a decision, he's going to

12   look and say, Why would I do that, why would I put my family at

13   risk, why would I put myself at risk if in the end I'm going to

14   get the same thing, I'm going to die in prison.

15        I think the Court also has to -- has to look at the

16   relationship between the sentence in Dr. Rana's case where

17   Mr. Rana was -- went to trial, did not accept responsibility,

18   did none of the cooperation here that the defendant did, none

19   of the extraordinary cooperation.

20        I think the Court should consider a sentence which is

21   less, as it usually happens, for the person who cooperates than

22   for the person who does not.

23        It was, of course, Mr. Rana's right to go to trial,

24   but I believe that it is not -- it is the rare case, the

25   exception, where there is not a benefit provided for the

1    individual who cooperates.

2           We've mentioned in our sentencing memorandum, Judge,

3    a -- because, frankly, it's very difficult to find comparable

4    cases.  We found, as we provided to you -- and this is a matter

5    of public record, so I can suggest that the *Babar* case, where

6    an individual who had been involved with very bad acts, but who

7    also provided substantial cooperation -- this was in the

8    Southern District of New York -- and he received a sentence of

9    what ended up being time served.  Four years and eight months.

10          We are not asking for a sentence that low, Judge, and

11   we would not.

12          But I'm -- I'm saying that the -- everyone recognizes,

13   other courts have recognized this, that you have to give a

14   benefit, or else people will not cooperate and will not provide

15   the -- what was done in this case.

16          Closer to home, it's not in our memorandum, but the

17   Court is familiar with the case of *United States versus*

18   *Calabrese*, 02 CR 1050, which was in this building.

19   Judge Zagel, an appreciated trial judge like yourself, who was

20   confronted again with the same situation.

21          This man had been involved with hands-on killing of

22   other individuals, and not because of some misguided religious

23   beliefs, but to protect a criminal operation or revenge or

24   for -- for greed.

25          And, Judge, but he testified and brought down a local

1    criminal operation that had been a terror on the streets of

2    Chicago for many years.  And even though he admitted to

3    participation in 14 murders, Judge Zagel, an experienced trial

4    judge, looked at that, and his sentence was 12 years based on

5    his extraordinary cooperation.

6            It's not a reward for Mr. Headley, Judge.  It's a

7    recognition that if people do not believe that they are going

8    to receive any benefit for cooperating and putting themselves

9    and their families through these things, then it just won't

10   happen, and the next time an individual is presented with

11   that -- with that option of which to do, that person is

12   certainly -- it would be contrary to common sense and

13   experience to believe that that person would -- would do what

14   Mr. Headley has done in this case.

15           I ask the Court to consider all of that, all of the

16   unprecedented, extraordinary, substantial cooperation that he's

17   provided, and weigh that against the conduct that he has

18   admitted to, and fashion a sentence, Judge, that will recognize

19   both of those extreme factors.

20           And I ask the Court to impose a fair sentence based on

21   that.

22           Thank you, Judge.

23           THE COURT:  Mr. Headley, would you like to make a

24   statement on your own behalf?

25           THE DEFENDANT:  No, your Honor.  I expressed

1    everything in the letter that I wrote to your Honor.

2              THE COURT:  Anything further?

3              MR. COLLINS:  No, your Honor.

4              THE COURT:  The difficulty in sentencing Mr. Headley

5    is -- has been, because of the horrific crime to which he pled

6    guilty to, and trying to weigh that with whatever cooperation

7    he did provide.

8              Now, going back, he has a history, long history, of

9    committing crimes and cooperating, and all the way back to 1988

10   when he got arrested for possession of a large amount of

11   heroin.  He agreed to cooperate and got -- he was very, very

12   handsomely rewarded on that.  And then about 11 years later, he

13   was caught with I believe a kilogram of heroin, and he again

14   cooperated.  And he again was treated very, very friendly by

15   the government.

16             Then he got involved in this particular crime.  And

17   based upon that history, I assume that he thought that he would

18   receive substantial assistance based upon cooperation.  And he

19   did provide cooperation.  I'm certainly not going to belittle

20   the cooperation.  I've seen both the official filings that the

21   government has made, as well as the in camera filings.  And the

22   cooperation has been most helpful.

23             However, he did the cooperation based upon the

24   agreement of the government to save his life.  He was facing a

25   death penalty, for obvious reasons, the seriousness of this

1    crime.  And the government, it's my understanding, right off

2    the bat agreed that they would not seek the death penalty.  And

3    not only that, they would not extradite him to either India or

4    Pakistan where, presumably, he would face very, very serious

5    consequences had that been done.  So that was his incentive to

6    cooperate.  And he did cooperate.

7            There's no ifs, ands or buts about it.  He cooperated.

8            And his cooperation -- I have to take the government's

9    word for it, and there's no reason for the government to

10   mislead me -- his cooperation was very, very helpful.

11           So when I get -- faced with what to do about

12   Mr. Headley, as far as a sentence is concerned, the easy

13   sentence would be, Mr. Headley, I'm going to impose the death

14   penalty on you because that's what you deserve.  That's based

15   upon the number of lives that you conspired to kill and the

16   number of lives which you attempted to conspire to kill but

17   fortunately were caught before that was able to be carried out,

18   and I'm talking about the Denmark situation on the latter, and

19   the Mumbai situation on the former.

20           I've heard -- I've received many statements from

21   victims, heart-rendering statements.  You all heard just one

22   just a moment ago.  And I've seen others and I've heard others.

23   And there's no doubt about it that the damage that was done is

24   just unfathomable to these people that survived.  Perhaps the

25   lucky ones were the ones that didn't survive.  They went to

 1   wherever reward they should receive.

 2           There's a number of things that I have to take into

 3   consideration.

 4           Mr. Headley is a terrorist.

 5           Now, Mr. Headley has written me a letter, he just

 6   referred to it, from about two or three weeks ago, in which

 7   he -- I believe in American values and way of life and

 8   certainly wish my children to be raised that way.

 9           That's one of his statements to me.

10           I have begun studying all the Scriptures that were

11   quoted to me out of context to justify violence and special

12   agenda of people, et cetera.  That -- that supposedly has led

13   to him to change his views of life.

14           And, finally, in the end, your Honor, I request

15   clemency and another chance to redeem myself.  I am capable of

16   change and feel I can still make some positive contributions

17   even in this late stage of life.

18           Now, going back, one of the -- the planning attack --

19   this is Mr. Headley's own words.  Concerning the planning

20   attack, in Denmark, he was quoting Mr. Sajid Mir, who was one

21   of the architects of that particular plan, and the quote was,

22   "All Danes are responsible."  And all Danes are responsible for

23   what the -- the cartoonist did as far as publishing cartoons

24   which were unacceptable to the Islamic religion.

25           Now, "All Danes are responsible" is a view, collective

1    guilt.  And I can only remember during the course of this

2    trial, and Mr. Headley took the stand for six or seven days,

3    and one of the questions he was asked, I believe it was on

4    cross-examination:  Mr. Headley, don't you have any feeling of

5    sorrow for the 164 people who were killed?

6         His answer was:  They're Indians.  They're responsible

7    because Pakistanis were killed up in Kashmir.

8         That's the -- basically the same view that he quoted

9    Sajid Mir stating about the Denmark people.  All the Danes are

10   responsible for these particular cartoons.

11        All of the Indians are responsible because some

12   individuals, Pakistanis were killed in Kashmir.

13        Now, I'm not here to say that either India or

14   Kashmir -- India or Pakistan is correct on who ought to have

15   control of Kashmir.  That's been a fight for a long, long time.

16   Apparently it's -- it's sort of resolving.

17        But his answer, both Mr. Mir and Mr. Headley's answer

18   at least in the course of the trial, was that, in one hand, all

19   Danes are responsible, and Mr. Headley's, as far as the people

20   who were killed in India are concerned, all Indians are

21   responsible because Indians killed Pakistanis.

22        It's this mindset that is obviously the most

23   troubling.

24        And when I go to evaluate the 3553 factors, one of the

25   most important one is to protect the public from further crimes

1    of the defendant.

2              There are other factors, too.

3              The nature and circumstances of the offense.

4              The history and characteristics of the defendant.

5              I don't need to go into detail of the nature and

6    circumstances of the offense.  They are about as bad as you can

7    imagine.

8              The characteristics of the defendant is that he

9    commits crimes and then he cooperates and gets rewarded for his

10   cooperation.

11             To reflect the seriousness of the offense is another

12   one of the 3553 factors.

13             And, again, the sentence -- a slap on the wrist type

14   of sentence would certainly not reflect the seriousness of the

15   crime.

16             To afford adequate deterrence to criminal conduct.

17   Now, we had, just a week ago or so, I was sentencing Mr. Rana,

18   the co-defendant in this particular case.  And I mentioned that

19   no matter what I do, as far as the sentence here is concerned,

20   it's not going to deter terrorists.  Terrorists don't care what

21   happens to them.  They go out and they act because of whatever

22   religious belief or whatever beliefs they have, as far as

23   hatred of other people or other religions, other nationalities,

24   and they act, regardless of whatever might be a problem to --

25   might happen to them.  These people that committed the acts in

1    India were, I believe, to a man killed.  It was anticipated in

2    Denmark that the government would respond to the killings in

3    the -- in the offices of the newspaper, so presumably the

4    people who carried it out would be killed.  That was

5    anticipated.  They would certainly probably have no problem

6    getting people, volunteers, to go ahead and commit these

7    particular acts.

8           So no matter what I do today, as general deterrence,

9    it's not going to be much good, unfortunately.

10          Now, to the extent it would -- to protect the public

11   from further crimes of the defendant, if he -- I don't have any

12   faith in Mr. Headley when he says that he's a changed person

13   and that he believes in the American way of life.

14          I remember distinctly his answer to that particular

15   question about whether he had any feelings towards the victims

16   in Mumbai, and his answer that they were guilty as the -- as

17   anybody else who kills other people are concerned.

18          So I do believe that it's necessary for me to protect

19   the public from Mr. Headley and make sure that he's never in a

20   position again to commit a terrorist act, even though perhaps

21   if he was allowed to, he would be able to cooperate and again

22   provide substantial assistance to the government.

23          I am certainly aware of the fact that the government

24   does not make motions based upon substantial assistance

25   lightly.  And, frankly, the recommended sentence here of 35

1    years is not a light sentence.

2              And the sentence I impose, I'm hopeful that it will

3    keep Mr. Headley under lock and key for the rest of his natural

4    life.

5              But I, again, I will accept the government's motion

6    and sentence him below life imprisonment, although the easy

7    sentence would be life imprisonment, because that's what he

8    deserves, but I will impose a sentence of 35 years in custody

9    of the Attorney General, to be followed by supervised release

10   of life.

11             And anything else I should put in there?

12             MR. COLLINS:  Your Honor, I believe there's

13   mandatory --

14             THE COURT:  35 years on each sentence to be served

15   concurrently.  That's 1 through 12, I believe.

16             I'll waive a fine for inability to pay.

17             And life supervised release.  Life again on each of

18   the 12 to be served concurrently.

19             MR. COLLINS:  Your Honor, I believe Count 11 was a

20   15-year max.

21             THE COURT:  Pardon?

22             MR. COLLINS:  Count 11, I believe, was --

23             THE COURT:  All right.  Count 11 is 15 years, and that

24   will be concurrent.

25             MR. SEEDER:  Judge, may we have a moment?

1          THE COURT:  Yes.

2       (Counsel conferring.)

3          MR. COLLINS:  Judge, one other issue as well is on the

4    statute for supervised release, for all but Count 11, the max

5    for supervised release is five years.  For Count 11, it's three

6    years.

7          THE COURT:  All right.

8          MR. SEEDER:  And they can't be ordered consecutively,

9    Judge.

10          THE COURT:  All right.  Five years supervised release

11    on each of the counts, three years on the Count 11, all to be

12    served concurrently.

13          Anything else?

14          MR. COLLINS:  Nothing from the government, your Honor.

15          Thank you.

16          THE COURT:  Did he waive appeal rights?

17          MR. COLLINS:  Yes.

18          MR. THEIS:  Yes.

19          THE COURT:  All right.

20          THE CLERK:  Assessment?

21          THE COURT:  Pardon?

22          THE CLERK:  Assessment.

23          THE COURT:  Oh, special assessment, 11 times 100,

24    1100 --

25          MR. COLLINS:  12.

1          THE CLERK:  12.

2          THE COURT:  Is it 12?  $1200.  We stand adjourned.

3          COURT SECURITY OFFICER:  All rise.

4      (Proceedings concluded.)

5                   C E R T I F I C A T E

6      I certify that the foregoing is a correct transcript of the

7  record of proceedings in the above-entitled matter.

8

9
   */s/ GAYLE A. McGUIGAN*                    *January 25, 2013*
10   Gayle A. McGuigan, CSR, RMR, CRR                Date
     Official Court Reporter
11                                            *January 25, 2013*
12   Gayle A. McGuigan, CSR, RMR, CRR                Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25